Hitchcock, J.
There is one question which seems to have been overlooked by counsel, but which it is apprehended is decisive of the case. Here are several complainants, having no community of interest, yet joining in the same bill. It is true they hold land derived from the same source and charged with a tax under similar circumstances. But still they hold in severalty separate parcels of land, each parcel charged with a separate amount of tax, and each parcel liable for the tax charged upon itself. Under these circumstances there is an improper joinder of parties, and for this reason, if for no other, the bill must be dismissed.
As, however, the case has been argued by counsel upon another point, which goes to its merits, we have thought proper to investigate it, regardless of any technical objections. The questions presented for consideration are of the first im]oortance, as they involve the validity of a legislative enactment of the state. But if that act does, as is contended, conflict with the constitution of the United States, it will be the duty of the court so to decide. If it does so conflict, it is unquestionably void, and can not be enforced. Even should we attempt to enforce it, there is a superior tribunal by which our proceedings might be reviewed, and any judgment or decree which we might render or pronounce might bo reversed.
It has been determined by the people of the United States, oras *237 others hold, by the individual states in their sovereign capacity, that the constitution of the United States shall be the supreme law of the land. In article 6 of that instrument, it is declared that “this constitution and the laws of the United States made in pui’suance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land, and the judges in every state shall bo bound thereby, anything in the constitution or laws of any state to the contrary *notwithstanding.” This constitution, the members of [237 this court, in conformity with the requisitions of the constitution of the State of Ohio, have taken an oath to support. When we cease to consider this constitution, or any law or treaty made in pursuance of it, as the supreme law of the land; when we give effect to any enactment of our own state legislature, which in our opinion manifestly conflicts with this supreme law, we violate the oaths which we,have taken. And it would seem to me that those who hold a contrary doctrine, those who advocate legislative supremacy, forget the nature of our constitutional governments, and base their principles upon the theory of the boasted “omnipotence of parliament.”
But although we entertain this opinion, still we hold that before we can declare a legislative act unconstitutional and void, on the ground that it violates the constitution of the United States, or any law or treaty made in pursuance thereof, or on the ground that it violates the constitution of this state, the case must be free from doubt, the violation must be palpable. So long as doubt remains the legislative act should be enforced.
In section 10, of article 1, of the constitution of the United States, it is provided that no state shall pass “any ex post facto law, or law impairing the obligations of contracts.” It is claimed by counsel for the complainants in the case under consideration, that the act of Ohio in pursuance of which the taxes complained of are assessed, is in violation of this provision.
The particular act of the legislature in pursuance of which the taxes complained of were levied, is the act of January 15, 1840, entitled “an act declaratory of an act passed March 14, 1831, pointing out the mode of levying taxes.” This act provides, “that lands set apart for school or ministerial purposes, and sold by and under authority of law, shall be, and the same are hereby declared to be subject to taxation, immediately after such sale, *238, 239 anything contained in the act to which this is an amendment to the contrary notwithstanding, and it is hereby made the duty of 288] the assessor of the proper *county, wherein such lands aré situated, to proceed to assess the same as directed in sections 9 and 10 of the act to which this is an amendment.” 38 Ohio L. 1.
There is certainly nothing in this law which of itself contravenes the constitution of the United States, or of this state. If in any case it has this effect, it must be in consequence of some previous legislation, or some previous state of things. A slight review of the course of legislation in the state upon subjects of this character will show that a provision of this kind is highly neoes-. sary and proper.
From the earliest period of the history of the state, it has been the practice to exempt lands set apart for'school or ministerial purposes from taxation. This has sometimes been done by special laws, exempting lands belonging to particular literary institutions, but more usually it has been done by exceptions in the general laws levying taxes upon land. Thus the act of March 14, 1831, “ pointing out the mode of levying taxes,” in section 2 provides, among other things, that “all lots of land or ground set apart for school-houses, academies, or colleges, with the buildings thereon .occupied for those purposes, and all lands the property of any such academy or seminary of learning, which now is, or may hereafter be established in this state, including all lands granted by Congress for the use of schools, academies, colleges, etc., shall be exempted from taxation. This is but a repetition of what before had been the law.
This legislation is in compliance with that clause of the constitution of the state, which requires that, “ schools and means of instruction shall be forever encouraged .by legislative provision.” While lands remain the property of any literary institution, it is aiding and encouraging that institution to exempt those lands from the burden of taxation. But so soon as they are conveyed to, and become the property of individuals, this reason for exemption ceases. And it is no good reason that an individual who becomes the owner of such lands should be privileged from contributing his proportionate share toward the expenses of the govern-289] ment under which he lives, ^because the land which he now owns has once been the property of a literary institution. Hence the propriety of the before-cited law of January 15, 1840.
*240 It is claimed, however, that this act can be of no .binding force as respects the lands now the subject matter of controversy, because by an act of the legislature of February 18, 1804, “establishing a university in the town of Athens,” it is provided that the lands in the township, of which these lands constitute a part, “ shall forever be exempt from the payment of all state taxes.” And it is said that here is a contract, the obligations of which can not be impaired by any subsequent legislation.
We still adhere to the opinion that certain acts of incorporation are in the nature of contracts, and that no subsequent legislature can repeal, or materially alter or change the same, without the assent of the corporators. That an act incorporating a literary institution is of this character, was decided by the Supreme Court of the United States in the case of Dartmouth College v. Woodward, 4 Wheat. 518.
The inquiry then will be, whether the declaratory act of January, 1840, when carried into effect, interferes with or materially changes any principle contained in the act, “establishing a university in the town of Athens,” when this latter act is properly construed and understood.
To a right understanding of the whole matter, as well as to aid in giving construction to the act incorporating the “ Ohio University,” it may be necessary to ascertain whence these lands were originally derived. They are situated in that tract of country usually denominated the Ohio Company’s purchase, and within the territorial limits of the present county of Athens. This purchase was ■ made of the Congress of the Confederation in the year 1787, previous to the adoption of the present constitution, by a company of individuals called the “ Ohio Company of Associates.” By the terms of purchase, it was agreed that section 16 in each township should be appropriated to the use of schools, and section 29 for the support of religion. In addition to this, two entire townships, as near *the center of the tract as might be, were to be appro- [240 priated for the purposes of a university. These sections and townships were donations from Congress for the purposes intended, although one objebt might have been, and probably was, to encourage the settlement of the country, and thereby enhance the value of the other lands of the United States. The donation of the townships was not to the Ohio University, for that was not in. *241 being, nor to any other particular university, but “ for the purposes of a university,” which might at some subsequent period be established, within the territory convoyed, at some future period. The two townships, eight and nine, in the 14th range, wore the townships eventually set apart in pursuance of this arrangement. Subsequent to the organization of the government of the United States under the present constitution, this contract, made by the “ Ohio Company of Associates” with the Old Congress, was confirmed by an act passed on April 21, 1792 (Swan’s Land Laws, 20) ; and the territory purchased was patented to certain individuals, as agents, in trust for the said company.
In 1799, the legislature of the Northwestern Territory, acting as trustees for the proper application of these two townships of land thus given by the United States for the purposes of a university, by resolution appointed certain individuals to lay off a town at the most suitable place within the townships aforesaid, with a view to the establishment of a college therein. Swan’s Land Laws, 219. The duty assigned 'these individuals was performed, and report thereof made to the legislature in 1800. This report was confirmed, and the town thus laid off named Athens. Swan’s Land Laws, 220.
On January 9, 1802, the same legislative body passed an act “ establishing a university- in the town of Athens,” then in the county of Washington, “by the name and stylo of the American Western University.” It is unnecessary to examine particularly this act of incorporation ; it is sufficient to say, that it conferred powers and privileges upon the university thus incorporated, at least as full and ample as those subsequently conferred upon the '241] “Ohio University.” In manyrespects *the powers and privileges were precisely the same. The t'wo townships of land donated by the United States “for the purposes of a university,” ■were expressly vested in this “American Western University.” Swan’s Land Laws, 220.
, What became of this corporation, whether it was ever organized, or whether it ever exercised any acts of ownership over these lands, I do not know. It would seem to have been dissolved by the act of February 4, 1804. by which the “ University of Ohio ” was incorporated, so far as it was in the power of the legislature ■■to dissolve it. This latter university was invested with all the *242 powers and privileges of the former, and even the lands vested in the former were by this act vested in the latter. The former act of incorporation is not repealed in so many words, but all acts and parts of acts containing anything in the purview of this act are repealed. It is clear, upon an examination of the two acts, that the latter is in contravention of the former, and if the principle be correct that an act of incorporation is in the nature of a contract, then the act incorporating the Ohio University is itself unconstitutional so far as respects those lands, as impairing the obligations of a contract, contained in the act incorporating the “American Western University,” It is impossible to escape this conclusion, unless it is upon the hypothesis that the trustees of this institution assented to the act incorporating the Ohio University. It is highly probable that such was the case, as, with but few exceptions, the same individuals are named as trustees of both institutions.
This act incorporating the “ Ohio University,” was enacted by the general assembly of the State of Ohio, as before stated, on February 4, 1804. Swan’s Land Laws, 226. In section 11 of this act, the two townships of land which had been given by the United States are vested in this university. The section is as follows: “ The two townships, eight and nine, in the 14th range of townships, -within the grant of land made by Congress to the Ohio Company of Associates, be and they are hereby vested in the corporation by this act created, in trust, for the use, benefit, and support *of the said university forever.” The act then goes on [2i2 to prescribe the manner in which these lands shall be leased, the terms and conditions of leases, the rent to be paid, etc.: “Provided always, that said corporation shall have power to demand a further yearly rent on said lands and tenements, not exceeding the tax imposed on property of the like description by the state, which rent shall bo paid at such timo and place, to such person, and collected in such manner as the corporation shall direct.” It is further enacted, that the clear annual rents and profits of all the es-. tate, both real and personal, of the corporation, shall bo appropriated to the endowment of the university. But no power is given to sell and convey any description of property. Having conferred power upon the coiporation to charge upon these lands, in addition to the rent reserved by contract, a rent equivalent to the amount of tax imposed by the state upon property of the like *243 description, the legislature noxt introduce the section relied upon by the complainants as the foundation of their case, in the following words: “’The lands in the two townships vested and appropriated as aforosaid, with the buildings which are or may be erected thereon, shall forever be exempted from all state taxes.”
These, it is believed, are all the provisions contained in the act of incorporation relative to these two townships of land, at least all that it is necessary to refer to, in order to a proper understanding of this case. It will be seen that they were not acquired by the corporation in pursuance of any contract of purchase, nor was the corporation vested with any other interest in the lands than the right to use and enjoy them in a particular manner, or rather the right to use and enjoy the rents and profits derived from them. The whole amount of the legislation is this: These two townships of land having been given by tho United States for the purposes of a university within tho Ohio Company’s purchase; and the legislature of Ohio, having established such university, enact that these lands shall be “ forever ” vested in the university so established, “in trust ” for the purposes intended in the donation, and 243] ^authorize the corporation, not to sell and dispose of these lands, but to lease them upon the terms stated in the act, and to appropriate the rents and profits to the endowment of the university. As a further encouragement tho corporation are authorized, in addition to the rents stipulated by contract, to charge the land with an additional rent, equivalent to any tax which may be charged by the state upon any property of the like description for state purposes. And having conferred this latter privilege, it is then declared that the same lands shall be “ forever ” exempted from a state tax.
Now what is the nature and extent of this exemption? Is it a privilege attached to, and running with the land? It seems to us that it can not be so considered, because tho land itself is not exempted from any burden. It is still liable to county taxation. And although a state tax, eo nomine, can not be charged upon it, still a charge equivalent to a state tax is imposed upon it, although bjr a different name — a charge not imposed from time to time by direct legislation, but by an act of the corporation in virtue of its organic law. The privilege,4then, is granted to the corporation, •not attached to the land.
What is the extent as to time of this privilege or exemption? *244 In point of time there is no limitation. It is to continue “forever.” Still this expression must be taken in connection with the other parts of the act of incorporation relative to the same subject matter, in order to arrive at the true intent and moaning of the legislature. Looking to this connection, it will be found that the lands themselves are “ forever ” vested in the corporation ; and it has the power while they are so vested, that is to say, “forever,” to lease them for a stipulated rent in conformity with the act of incorporation, and in addition to these rents thus stipulated, the corporation have power to charge and collect an additional rent, equivalent in amount to a state tax. And the rents so collected, the corporation is bound to appropriate for the purpose of endowing the university. Taking all these circumstances together, and it seems clear that it was not the intention of the legislature to continue the exemption for any longer period than the land remained ^vested, “in trust,” in the corporation. While so [244 vested no state tax could be levied, nor could the corporation at any subsequent period, without its assent, be divested of the lands themselves. But if, with the assent of the state, these lands should bo conveyed to individuals, or if the charter of incorporation should be forfeited, it is not perceived with what propriety the state can any longer be restrained from charging them with a tax.
At the time this act of incorporation was passed, it was undoubtedly expected that these two townships of land would “forever ” remain vested in the corporation, and being so vested, would forever be exempted from taxation for state purposes. In the early period of the government, it seems to have been the policy to authorize incorporated -literary institutions to hold lands, but not to sell and convey, depending for the rents and profits as the source from which to derive iunds. The act to incorporate the “ Ohio University ” was passed at the second session of the state legislature, and contains such a provision. This was the second institution of the kind incorporated by the state government. At the first session, “The Trustees of the Erie-Literary Society’’ were incorporated, the act of incorporation containing a similar provision. This same principle is contained in all the early laws with respect to school lauds. But in later times the policy has been changed, and the sale of lands appropriated to literary purposes authorized. Whether this change is founded in wisdom, it *245 is not for this court to say; and these things are adverted tor merely to show the influence which operated upon the legislature at the time the act of incorporation now under consideration was ssed — an influence as well known and understood by the cor. porators as by the members of the general assembly. At that time it was not contemplated by any one, that lands in Ohio appropriated to literary purposes would ever become individual property.
Frequent amendments were made to the act incorporating the Ohio University, from time to time, both as to the mode of leasing 245J their lands and as to other matters, and perhaps no one Haw was more frequently before the general assembly than this for some .kind of action. In less than ten years from its passage, no less than ten amendatory and supplemental acts were enacted. But no change was made as to the tenure of the land with which the corporation was vested until 1826. On the 4th of February of this year, an act was passed authorizing the corporation to sell and convey in fee simple such lands in the two townships as were not incumbered by leases, and also to make a similar title to such lease-holders, as should pay for the land by them leased, a sum so great, that the interest thereon at six per cent, per annum would be equal to the rent reserved. This act was passed with the assent of the corporation, and the lands of the complainants were sold and conveyed in pursuance thereof.
What further interest have the corporation in these lands ? None whatever. It has conferred upon the complainants the highest character of title which is known to our laws. What becomes of the privilege of charging rent upon these lands, equal in amount to a state tax? It is gone, unless we admit the absurd principle that, after having made to these complainants a title in fee simple, the corporation possess the power to charge the land so conveyed with rent, equivalent to a state tax. This principle can not be admitted, and it follows that if the position assumed by complainants’ counsel _ is correct, these lands are now freed from the payment of a state tax or anything equivalent thereto. By the act of incorporation they were exempted from the payment of a state tax, in consideration that a charge equivalent thereto might bo imposed upon them by the corporation. By the conveyance to the complainants they are freed from this last charge.
Will it be claimed that the purchasers of these lands succeed to *246 all the rights and privileges of the corporation, and as the land in the hands of the corporation was exempted from taxation, therefore it must be exempted in the hands of their vendees? What were the rights of the corporation with respect to these lands? They had power to lease, but not to sell them. And the rents received must be appropriated for a particular ^purpose, that [246 is, for the purpose of endowing a university. This is not the situation of those holding by'purchase from the corporation. Such purchasers may lease or sell at their election. If they lease, they are not bound to appropriate the rents in a particular manner, but may appropriate them as. they please. But if they lease, they can not, like the corporation, impose any rent in addition to that stipulated by contract. In truth, these purchasers have a more perfect title than had the corporation. They have a title in fee simple. But we can not admit that they possess any rights superior to other tenants in fee simple, deriving title from a different source.
In whatever aspect we view this case, it seems to us that the only proper construction which can bo put upon the act of incorporation now under consideration is, that the lands in these two townships being vested in the university, in trust, for a particular purpose, are to be exempted from taxation 'for state purposés, so long as they continue thus vested, and no longer. But when the corporation ceases to have'any interest in them, when they become individual property, they are liable to be treated like other individual property of the same description, and equally subject to taxation.
It is supposed, by complainants’ counsel, that this opinion conflicts with the opinion of the Supreme Court of the United States in the case of the State of New Jersey v. Wilson, 1 Cranch, 164. We have examined that case with careful attention, and, after such examination, do not perceive that it operates against the opinion already expressed. There is, perhaps, a general resemblance between that case and the one now before the court, but there are several material points of difference, while there is but one of exact similarity.
The facts of that ease are, in substance, these: A remnant of the tribe of Delaware Indians had claims to a considerable portion of lands in New Jersey, to extinguish which became an object with the government of the then colony. For this purpose a *247, 248 convention was held between the Indians and commissioners appointed by the government of New Jersey. On August 9, 1758, 247] the Indian deputies made to the commissioners *a proposition in writing, the basis of which was, that the government should purchase a tract of land on which the Indians might reside, in consideration of which they would release their claim to all other lands in New Jersey south of the river Raritan. This proposition was assented to by the commissioners, and the legis lature, on the 12th of the same month, passed an act to give effect to this agreement.
This act, among, other provisions, authorizes the purchase of land for the Indians, restrains them from granting leases and making sales, and enacts that the lands to be purchased for the Indians “ shall not hereafter be subjected to any tax, any law, usage, or custom to th'e contrary thereof in any wise notwithstanding.” In virtue of this act, the convention with the Indians was executed. Lands were purchased and conveyed to trustees for their use, and the Indians released their claim to the south part of New Jersey.
The Indians continued in peaceable possession until some time in the year 1801, when they applied to the legislature of the State of New Jersey, and obtained an act authorizing the sale of the land.
In 1803, the commissioners under this act sold and conveyed the lands to Wilson, Painter, and others, and in October, 1804, the legislature passed an act, repealing so much of the act of 1758 as exempts the land from taxation. The lands were then assessed and the taxes demanded.
The case was brought before the court by writ of error to the Supreme Court of New Jersey, and the question submitted was, whether the repealing act of 1804 was in violation of that part of the constitution of the United States, which declares that no state shall “pass any bill of attainder, ex post facto law, or law impairing the validity of a contract.”
The court decided that the repealing law was unconstitutional and void.
In pronouncing the opinion of the court, Chief Justice Marshall says: “Every requisite to the formation of a contract is found in the proceedings between the then colony of New Jersey and the 248] Indians. The subject was a purchase, on the *part of the *249 government, of extensive claims of the Indians, the extinguishment of which would give it the title to a large portion of the province. A proposition to this effect is made, the terms stipulated, the consideration agreed upon, which is a tract of land, with the privilege of exemption from taxation; and then, in consideration of the arrangements previously made, one of which this act of assembly is stated to be, the Indians execute their deed of cession. This is certainly a contract clothed with unusual solemnity. The privilege, though for the benefit of the Indians, is annexed, by the terms which create it, to the lands itself, not to their persons. It is for their advantage that it should be annexed to the 4and, because in the event of a sale, on which alone the question could become material, the value would be enhanced by it. The purchaser succeeds, with the assent of the state, to all the rights of the Indian. He stands, with respect to this land, in their place, and claims the benefit of their contract.”
This reasoning would seem to be conclusive, but how does the case compare with the one before this court. In that case there had been a contract of purchase and sale, or rather exchange. The Indians had parted with a vast amount of property, and to induce them to do it, the government stipulated that the land purchased for their use should not be thereafter “ subject to any tax.” For this privilege a full and ample consideration was paid. The exemption from taxation was a privilege annexed to tho land itself, and there is nothing in the act, so far as appears from the report of the case, to show that it was intended to be confined to the persons of tho Indians. And it might well be said by the court, that “the purchaser succeeds, with the assent of the state, to all the rights of the Indians. He stands, in respect to this land, in their place, and claims the benefit of their contract.”
In the case no-w before this court, there was no formal contract; no consideration passing from the Ohio University to tho State of Ohio. The act which it is claimed must operate to exempt forever certain lands from taxation, was the act by which it was brought into existence. In passing this act the *general [249 assembly conferred upon this corporation extensive powers and privileges. One of these privileges was, that two townships of land which had been donated by Congress for the purposes of a university should be vested in it for certain purposes, which have been already referred to, and while so vested should be exempt *250 from taxation. This exemption, although by its terms it might Üe considered as a privilege annexed to the land, was not so in fact, inasmuch as the land, while vested in the corporation, was subjected to a charge equivalent to a state tax, although not by that name. Neither could a subsequent purchaser from the university when that corporation was authorized to convey in fee simple, be considered as succeeding to the rights of the university. His rights are of an entirely different character.
In these three leading particulars, there is a material difference between the case of the State of New Jersey v. Wilson, and the case now before this court. They agree in this, however — in both cases there is in terms a perpetual exemption from taxation. By the law of New Jersey, it is declared that the land to be purchased for the Indians shall “not be hereafter subject to any tax;” by the law of Ohio, that the lands vested in the Ohio University “ shall forever be exempted from all state taxes.” But this clause in the Ohio law must be taken in connection with other parts of the same law relative to these lands. And when taken in this connection it seems clear to the court, that it was not the intention of the legislature that this exemption should continue for any longer period than for the time the land should be vested in the corporation, in trust for the purposes in the act specified.
As well, then, for the reason that there is no equity in the complainants’ case, as for the reason that there is a misjoinder of parties, the bill must be dismissed, at the costs of the complainants.
Bill dismissed.