### E. BEMENT & SONS v. LA DOW.

#### (Circuit Court, N. D. New York. March 4, 1895.)

#### No. 6,036.

1. CONTRACTS—FRAUDULENT REPRESENTATIONS—EXTENT OF PATENT RIGHTS.
    B. & Sons and L. entered into a contract, by which B. & Sons took a license under L.'s patents, existing and to be thereafter granted, for harrows like a sample furnished, and agreed to manufacture certain numbers of harrows in each year, and to pay L. certain royalties thereon. After manufacturing the harrows and paying the royalties for some time, B. & Sons brought suit against L. to set aside the contract on the ground that it was obtained by fraudulent representations on L.'s part to the effect

that his patents covered an entirely new field and involved an entirely new principle. In such suit it appeared that both parties, at the time the contract was made, were familiar with patents and patent litigation, and especially with harrows and the state of the art relating thereto, and were persons of unusual intelligence; that the main point of difference between B. & Sons and L. was as to whether L. had represented himself to be the first to introduce each of two valuable features in harrows, or to be the first to introduce them in combination, one statement being false and the other true, and the falsity of the former, if made, being easily ascertainable; that B. & Sons had been anxious to make the contract, had sought out L., and, on seeing the harrow, had expressed their satisfaction with it and their desire to obtain a license; that B. & Sons had had full opportunity to examine and test a sample harrow, and to investigate the state of the art, before concluding the contract; and that, after the harrows were placed on the market, they sold readily in large numbers, and B. & Sons repeatedly expressed their satisfaction with them, and were not molested by attempted infringements. *Held*, that there was no evidence of fraudulent misrepresentations inducing the contract.

**2. SAME—RATIFICATION.**

It further appeared that, if L. had made fraudulent misrepresentations, the fact must probably have been disclosed to B. & Sons within a few months after the making of the contract, and certainly by circumstances which occurred about two years after the making thereof, but that, instead of rescinding the contract immediately, B. & Sons continued to manufacture the harrows, and to assert, in negotiations with a third party, the value of the contract, and sold it to such third party for a large sum. It also appeared that, in an action by L. for royalties, B. & Sons had set up fraud as a defense, and, upon such defense being overruled, had obtained a reassignment of the contract, and tendered the same back to L., but without offering to return any of the profits made under the contract. *Held*, that by continuing to treat the contract as existing, after discovering the supposed fraud, and by retaining its fruits, B. & Sons ratified such contract.

This was a suit by E. Bement & Sons, a corporation, against Charles La Dow to set aside a contract for fraud. The cause was heard on the pleadings and proofs.

*Henry J. Cookinham,* for complainants.
*Alden Chester,* for defendant.

COXE, District Judge. On the 22d day of March, 1889, the parties to this action entered into an agreement, which, so far as its stipulations affect the issues in this cause, is as follows:

"Agreement or License.

"Know all men by these presents: That whereas, C. La Dow, of Albany, New York, is the owner of a large number of patents on spring-tooth harrows, and Messrs. E. Bement & Sons, of Lansing, Michigan, are desirous to obtain rights to manufacture at Lansing, Michigan, and sell throughout the following territory, the harrow invented by said La Dow, which is represented by the sample furnished said E. Bement & Sons by La Dow, and La Dow consenting thereto, therefore this agreement witnesseth: * * * That said La Dow hereby grants license to said Bement & Sons to build spring-tooth harrows (like the sample furnished them by La Dow) at Lansing, Michigan, under La Dow's patent of March 11, 1884, for the territory of the United States, except the counties of Albany, Schoharie, Greene, Delaware, Schenectady, Rensselaer and Saratoga, in the state of New York, for and during the life of any patent now granted, or that may be granted said La Dow which relates to said harrow, upon the following terms and conditions, viz.: La Dow grants this license exclusive under said patent so far as embodied in said harrow, and also under patent to be applied for on said harrow, for the ter-

ritory of the United States, excepting the territory hereinbefore reserved, and except that La Dow reserves the right to license to others within the territory hereinbefore granted said Bement & Sons, rights to use his inventions of fastening teeth directly between opposing parts of a harrow frame, without the use of a 'clip' when used in harrows, in which the frame bars do not stand edgewise vertically; and La Dow also reserves the right to use said invention in said territory in such style harrows as the 'None Such,' now made by McSherry & Co., of Dayton, Ohio, upon the conditions that the said Bement & Sons will build the said harrows substantially the same as the sample furnished them by La Dow, and in a substantial and workmanlike manner and of good finish, painting the harrow frames red and the teeth black, that they will thoroughly advertise and push the sale of said harrows in all of said territory, and use their best endeavors to sell as many of them in each year as possible, and to pay the said La Dow, his representatives or assigns, during the continuance of this agreement a royalty on each harrow made by them, as follows: Said Bement & Sons agree 'to pay royalty on not less than two thousand (2,000) of said harrows for the year 1889 at a royalty of fifty cents per harrow, payable one-half July 1, 1889, and one-half December 31, 1889. They also agree to build and pay for not less than ten thousand (10,000) of said harrows for the year 1890 and to build and pay on not less than ten thousand (10,000) harrows in each year thereafter during the four years following, viz.: The years 1891, 1892, 1893 and 1894, and to pay to said La Dow or assigns a royalty of fifty cents on each harrow made in each of said five years aforesaid. The royalty year to begin January first in each year and the royalty to be paid as follows: Twenty-five hundred ($2,500.00) dollars of the amounts specified shall be paid on July first, and the balance of twenty-five hundred ($2,500.00) dollars together with royalty on any excess of the number specified shall be paid on December 31st of each year beginning July 1, 1890, and ending December 31, 1894. * * * Said Bement & Sons may bring suits against infringers at their own expense, and for their own benefit, except that La Dow shall retain his equity of fifty cents per harrow against all who infringe his patent, and said amount shall be paid La Dow as damages out of any money collected by Bement & Sons from infringers. * * * In case said Bement & Sons do not fulfill the terms and conditions of this contract, La Dow may declare it void and the rights hereby conveyed shall thereupon revert to La Dow or his assigns. Said Bement & Sons hereby accept said terms, and agree to faithfully fulfill their part of the same, for and during the time named, and that the same shall be binding on their representatives, successors or assigns. In witness thereof, the parties have hereunto set their hands and seals this 22d day of March, A. D. 1889.                           Charles La Dow.

"E. Bement & Sons,
"By A. O. Bement, President."

On the 2d day of September, 1889, the parties entered into a second agreement by which La Dow extended the license to the counties excepted from the original agreement. The royalty for these counties was fixed at $1 per harrow on not less than 500 harrows annually.

Briefly stated, there was a contract by which Bement & Sons took a license under La Dow's patents existing and to be thereafter granted for harrows, like the sample furnished, and agreed to manufacture not less than 2,000 harrows for the first year and not less than 10,500 for the five succeeding years and to pay La Dow 50 cents royalty for each harrow sold and a dollar royalty for harrows sold in the territory specified in the second agreement. The complainants seek to set aside these agreements and to recover $3,500 paid thereunder by them to the defendant, on the ground that they were induced by fraudulent representations made by La Dow and relied upon by them. These representations are alleged to

be in substance as follows: Before the execution of the agreements La Dow stated to the complainants that he was well acquainted with the state of the art relating to harrows; that his inventions involved an entirely new principle, viz. that of grasping the harrow teeth edgewise, and also a harrow frame of zigzag form; that his patents, applications and inventions were very valuable and covered the two features referred to and the entire field; that he was the first to conceive of the idea of holding the teeth edgewise; that his inventions covered this field so completely that there would be no trouble or annoyance by other parties; that the complainants if they took the license would have this field entirely to themselves so far as the two features of clasping the teeth by the edges and the frame of zigzag form were concerned.

The defenses are—First, that no fraudulent representations were made; second, that complainants with full knowledge of all the facts relating to the alleged fraudulent representations ratified and confirmed the agreements; third, that complainants have not offered to restore all that they have received under the agreements and are not entitled to relief until they do this—restitution is now impossible; and, fourth, that the judgment in the action at law, in which La Dow recovered in this court for royalties under the agreements, is res judicata upon the present issues.

The law applicable to controversies of this kind is clearly stated in Development Co. v. Silva, 125 U. S. 247, 8 Sup. Ct. 881. The supreme court said:

"In order to establish a charge of this character the complainant must show by clear and decisive proof—First, that the defendant has made a representation in regard to a material fact; secondly, that such representation is false; thirdly, that such representation was not actually believed by the defendant, on reasonable grounds, to be true; fourthly, that it was made with intent that it should be acted on; fifthly, that it was acted on by the complainant to his damage; and, sixthly, that in so-acting on it the complainant was ignorant of its falsity, and reasonably believed it to be true. The first of the foregoing requisites excludes such statements as consist merely in an expression of an opinion or judgment honestly entertained; and, again (excepting in peculiar cases), it excludes statements by the owner and vendor of property in respect to its value."

It is thought that the third of these propositions should be qualified by the further statement that if the defendant conveys the impression that he has actual knowledge of the existence of the facts when he is conscious that he has no such knowledge, he is as responsible for the injury caused by such representations, to one who believes and acts upon them, as if he had actual knowledge of their falsity. Iron Co. v. Bamford, 150 U. S. 665, 673, 14 Sup. Ct. 219; Marsh v. Falker, 40 N. Y. 562. In Slaughters' Adm'r v. Gerson, 13 Wall. 379, the supreme court said:

"Where the means of knowledge are at hand and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he has been deceived by the vendor's misrepresentations. If, having eyes, he will not see matters directly before them, where no concealment is made or attempted, he will not be entitled to favorable consideration when he complains that he has suffered from his own voluntary blindness, and been misled by overconfidence in the statements of another."

Farnsworth v. Duffner, 142 U. S. 43, 12 Sup. Ct. 164; Farrar v. Churchill, 135 U. S. 609, 10 Sup. Ct. 771.

Mere expressions of opinion as to the value of property are not actionable; they are regarded as "trade talk" which every man of intelligence receives cum grano salis. Gordon v. Butler, 105 U. S. 553; Mooney v. Miller, 102 Mass. 217. In Dillman v. Nadlehoffer, 119 Ill. 567, 7 N. E. 88:

"The defendant represented to plaintiffs that said improvements were his own invention, and that the patents issued thereon were genuine and valid, and that they did not conflict with or infringe upon the patents or inventions of any one, and particularly those controlled by the Washburn & Moen Manufacturing Company and J. L. Ellwood or their licensees."

The court held that these were expressions of opinion merely not actionable in a court of equity in a suit for rescission. Reeves v. Corning, 51 Fed. 774. These principles are elementary and it is unnecessary to multiply authorities.

The fraudulent representations alleged in the bill and stated in the proof are numerous and complicated, but it will be seen at a glance that some of them are true, others, mere expressions of opinions, and others still, only repetitions of what had previously been stated. They may all be fairly condensed into the statement that the defendant made the false representation that his patents, applications and inventions covered an entirely new field and involved an entirely new principle, namely, that of grasping the teeth edgewise, and also a harrow frame of zigzag form. In other words, the defendant represented that he was the inventor of a zigzag harrow frame and the principle of clasping the teeth edgewise. Was this statement made? Was it false? Did the defendant know it to be false or did he make it in such terms as to produce the belief in the complainants' minds that he had personal knowledge of its truth? Did the defendant make it with intent to deceive? Did the complainants believe it to be true and rely on it to their injury?

In approaching the consideration of these questions it is wise at the outset to have in mind some general observations. Imprimis, this is not a controversy between a meek, innocent, ignorant and confiding party on the one side and a powerful, overreaching, shrewd and unscrupulous party on the other. It is not a dispute between the lamb and the wolf. These parties are all of them men of mature age and more than ordinary intelligence. The complainants for many years had been engaged in the manufacture of agricultural implements; they had manufactured and sold spring-tooth harrows and they were familiar with patents and patent litigation. Three days before the first license was signed one of the complainants had received a patent as inventor of an improvement on spring-tooth harrows. In short, it would be difficult to find parties better equipped in every way to take care of their own interests in a bargain. Again, the contracts were executory in character. They were to last from March, 1889, to January, 1895. During the five years and more that the licenses had to run a false statement regarding the patents would certainly be

discovered. With the field full of rival manufacturers and the records of the patent office open alike to all, it is hardly possible that five years could have rolled away without the fraud being exposed. Detection was almost certain to follow. Is it likely that an intelligent man would make false statements to procure the signature of another to an executory contract when, long before the benefit could be reaped by him, his fraud would be discovered and his contract voided? It should also be borne in mind that no property is so uncertain as "patent rights"; no property more speculative in character or held by a more precarious tenure. An applicant who goes into the patent office with claims expanded to correspond with his unbounded faith in the invention, may emerge therefrom with a shriveled parchment which protects only that which any ingenious infringer can evade. Even this may be taken from him by the courts. Indeed, it is only after a patentee has passed successfully the ordeal of judicial interpretation that he can speak with any real certainty as to the scope and character of his invention. Especially is this true of patents on spring-tooth harrows, which have for years been the subject of fierce and prolific litigation. Every one familiar with patents knows this and yet there is no class of people so apt to deal in hyperbole as patentees and those expert in patent matters. If the gentlemen whose vocation it is to express opinions as to the value of patents were held pecuniarily responsible for every ill-founded statement it is safe to infer that there would be a marked contraction either in the views or the incomes of a large number of mechanical experts.

The defendant is a prolific inventor of harrows, and of agricultural implements generally. Although it is highly probable that he took an optimistic view of his invention and indulged in a large amount of "trade talk" the court cannot believe that he made any false statements willfully and with intent to injure the complainants. A careful study of the record leads to the conclusion that the complainants must have misunderstood the defendant, that every presumption is against his having made the false statements before alluded to and that there was an entire absence of motive for the perpetration of such a fraud. The defendant has given his version of the conversations with the complainants and when the two statements are placed side by side it will be seen how little they differ and how easily the complainants might have misunderstood the defendant:

| Complainants' Version. | Defendant's Version. |
| --- | --- |
| "He said that his device covered two radical features in spring-tooth harrows, one of which consisted of the plan of holding the tooth by its edges instead of flatwise, and the other was the zigzag frame. That his inventions of holding the tooth by edges and of the zigzag frame were absolutely new and novel and could not be used by anybody else, in any form without infringing his patent." | "I told him I was the inventor of a zigzag frame and spring tooth combined, that I was also the inventor of holding the curved spring tooth directly to its zigzag beams without the intervention of clips, tooth seats or any other toggling device, and that whoever built that harrow would not be liable to suits for infringement as were all who were using clips, curved seats," etc. |

It will be observed that the main difference between the two statements is that complainants testify that La Dow said he was the first to make a zigzag frame and was also the first to make an edgewise clasp; while he testifies that he said he was the first to make a zigzag frame and an edgewise clasp in combination; and yet one statement is false and the other true. If the defendant in speaking of the two features of his invention used the words "in combination" there was no fraud. That the complainants are mistaken in their version seems probable from the following additional considerations:

The license is barren of anything to corroborate the complainants' theory. It recites that it is a license to make and sell "the harrow invented by said La Dow, which is represented by the sample furnished said E. Bement & Sons by La Dow." This was the sample "Steel King" which complainants had full opportunity to examine, did examine, and about which there was never the slightest concealment. Further on the license reserves to La Dow the right to give others the right "to use his invention of fastening teeth directly between opposing parts of a harrow frame without the use of a 'clip' when used in harrows in which the frame bars do not stand edgewise vertically." About the time of the first license both parties published circulars setting forth the peculiar excellences of the "Steel King" and neither states what the complainants now assert; on the contrary, the invention is described in conformity with the present contention of the defendant as follows:

"This harrow has no 'clips,' 'curved seats,' 'tooth fasteners,' nor 'trap' of any kind, but is a thoroughly practical, common-sense, every-day and every-year harrow, having its teeth attached directly between opposing sides of the frame and held in any desired position by the ribs of the channel steel frame, and having more adjustments, and those more easily made, than any other harrow in the world. The feature of attaching the tooth to the frame without a clip is of the greatest importance. This can readily be seen to be a bed-rock principle in harrows, which no amount of ingenuity on the part of other harrow inventors can evade, as the principle must necessarily apply to any manner of fastening the tooth which does not use a clip. The importance of getting rid of all toggling and clips is a self-evident fact."

Is it not reasonable to believe that if the complainants had supposed that they controlled broadly the principle of holding harrow teeth edgewise and also the zigzag frame as separate inventions, they would have made some allusion to it in these circulars? It is a matter of common knowledge that owners of patents do not usually understate their inventions, or establish their own reputation for diffidence and modesty, in their "circulars to the trade." The court does not overlook the fact that in a circular put out by complainants some months later—in January, 1890—a statement is made regarding La Dow's right to the broad principle of holding the teeth edgewise which conflicts with, and, to some extent, impairs the force of the presumption based upon the earlier circulars. But it taxes human credulity too far to believe that La Dow could have laid claim to a principle, which, when broadly considered, was one of the oldest and best known in the harrow art.

It should also be remembered that the complainants sought out the defendant; that the "Steel King" was only shown them after numerous other harrows had been examined and that from the moment it was seen by complainants' president he expressed his entire satisfaction with it and appears to have been eager and anxious to conclude an arrangement. It is very clear that before La Dow went to Lansing the bargain had been practically consummated with the single proviso that the harrow frame shown at Albany was to be expressed to Lansing and was to please all of the complainants when received. It had already pleased one of them. They were earnestly desirous to procure the right to make and sell the "Steel King" without a day's delay. It was not necessary to cajole them into a bargain as to the wisdom of which they were in doubt. It needed no false statements to induce them to take a license. Had there been any wavering or reluctance on their part there would be more plausibility in their present contention.

It remains to be considered whether the defendant made any false statement with intent that it should be acted on by the complainants and whether they did act on it to their damage, believing it to be true. The following propositions must be conceded: First. The complainants could not have relied upon any patent granted to La Dow subsequent to March 11, 1884, and prior to March 22, 1889, for it would have been stated in the contract. Second. They could not have supposed that the patents of March 11, 1884, covered the "Steel King" in all its details, because they were expressly informed by La Dow that the "Steel King" was a new invention which had been kept secret, they being the first manufacturers who had seen it, and that it was to be secured by patents subsequently granted. Third. The complainants had every possible opportunity to examine and test the sample harrow before making the first contract. The defendant's volume of patents containing a vast number of patents for harrows, including his own, was shown to and left with the complainants, certainly before the second contract was executed, and they might have examined the entire art as there set out had they seen fit. Fourth. The patents subsequently granted to La Dow fully covered the "Steel King." These patents must be assumed to be valid in this controversy and it cannot be successfully denied that the complainants were fully protected in the manufacture and sale of the "Steel King." No one else had attempted to make it. No one had sued the complainants for infringement.

How, then, can an intent to defraud be imputed to the defendant; how can it be said that the complainants relied upon false representations or that they suffered injury by so doing? As before stated, what they ardently wanted to secure was the right to make and sell the "Steel King." They secured that right. They made the harrow without molestation. Their success, considering that it was an entirely new tool, was phenomenal. The first year they made 875 harrows, the second year 4,435, the third year 5,617, and, during the first four months of 1892, prior to the commencement

of this suit, 3,341, or over 10,000 for 1892, if the same proportion continued for the remainder of the year. It was asserted at the argument and not denied that up to that time a harrow substantially the same in all respects had been made by the complainants. It is not easy to perceive what more could have been done even though defendant had been the inventor of the zigzag frame and also of the edgewise clasp and had told the complainants of it before they made the contract. There were no complaints at any time until after litigation began that the harrow was not meeting all the complainants' anticipations. It certainly was a success and almost justified the superlative praise lavished upon it by complainants. In June, 1889, they wrote:

"It looks as though the only thing in the market beyond controversy is the 'Steel King.' It is certainly the finest looking tool we have ever seen."

In May, 1890, over a year from the first contract, they wrote La Dow:

"We have not yet put out a tool which has been received with such universal satisfaction as the 'Steel King.' There is no doubt at all in our minds but that it will be the most universally used tool that has ever been put on the market. The two manners of putting in the teeth seem to make it all that even the most critical farmer requires."

Even after the complainants had been sued for royalties and were fully cognizant of all the facts regarding La Dow's invention their president in June, 1891, argued at the meeting of the harrow company, "that he had demonstrated the selling qualities of his harrows and he believed that he had the best harrow on the market."

These statements seem wholly inconsistent with the theory of fraud. Indeed, the impression produced on the mind of the court, after an examination of the testimony and the numerous exhibits, is that the contracts, though unilateral in some respects, and, perhaps, improvident, were nevertheless agreements, which, if carried out in good faith by the complainants, would have brought large profits to both parties. The failure to do this is, it is thought, to be attributed to the complainants' connection with the National Harrow Company. After they had joined that combination and the licenses had ceased to be of special value they sought to relieve themselves of a burdensome obligation by interposing a claim which would never have been heard of but for the changed relations of the parties.

Although the complainants' contention has been presented in a most able and persuasive argument the court is unable to accept the theory of fraud. Fraud cannot be inferred; it must be proved; and even though the court were in doubt it should hesitate long before striking down the character of one who has hitherto led an upright and blameless life.

But there is another insuperable barrier in the complainants' path. With full knowledge of the facts they acquiesced in and ratified the contracts. It is a fundamental principle of equity that a party who seeks to avoid a contract on the ground of fraud must

v. 66F.no. 3—13

disaffirm it at the earliest possible moment after the discovery of the fraud. He cannot thereafter act under the contract, accept its benefits himself or deprive the other party of them and repudiate it when it suits his convenience. He cannot reap the advantages derived from the contract and also those derived from a repudiation of the contract. He must elect whether he will treat the contract as void or valid. If he chooses the former he cannot thereafter deal with the property as his own or receive any consideration by virtue thereof. He must restore or offer to restore whatever benefit he has received. If he does not do so it will be presumed that he is satisfied with the contract. The contract must be treated as if it had never been made and the parties placed, as far as possible, in the position in which they were before it was executed. He who asks equity must do equity. It is not doing equity for a party to keep a contract so long as it is useful, retain everything of value received thereunder, and repudiate it only when nothing more can be made out of it. He cannot denounce a fraud of which he is the beneficiary. A court of equity will not deliver its judgment into hands which are tainted with the gains of fraud. Regarding this rule there can be no doubt. It is clearly stated by Judge Andrews in Schiffer v. Dietz, 83 N. Y. 300. On page 307 he says: "The plaintiff was entitled, on the discovery of the fraud, to demand a rescission of the sale and conveyance, and the restoration of the money and securities received by the defendant. But a party entitled to rescind a contract for fraud may deprive himself of this remedy by acquiescence; or where the transaction is a sale of property, by his dealing with the property as owner after the discovery of the fraud. A party claiming to rescind a contract for fraud must act promptly on discovery of the fraud, and restore or offer to restore, to the other party what he has received under it. He cannot thereafter deal with the other party on the footing of an existing contract, or with the property acquired under it as his own."

"When a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and lose. Delay and vacillation are fatal to the right which had before subsisted. * * * A court of equity is always reluctant to rescind, unless the parties can be put back in statu quo. If this cannot be done it will give such relief only where the clearest and strongest equity imperatively demands it." Grymes v. Sanders, 93 U. S. 55, 62.

"The general principle is, that he who seeks equity must do equity; that the party against whom relief is sought shall be remitted to the position he occupied before the transaction complained of. The court proceeds on the principle, that, as the transaction ought never to have taken place, the parties are to be placed as far as possible

in the situation in which they would have stood if there had never been any such transaction." Neblett v. Macfarland, 92 U. S. 101.

As soon as the party defrauded discovers the fraud he must act; that is, as soon as he has knowledge of the material facts which show the actual perpetration of the fraud. He cannot excuse his inaction by asserting that he did not know all of the evidence which tends to prove the main fact. Bach v. Tuch, 126 N. Y. 53, 26 N. E. 1019.

Prof. Pomeroy states the rule as follows:

"All these considerations as to the nature of misrepresentations require great punctuality and promptness of action by the deceived party upon his discovery of the fraud. The person who has been misled is required, as soon as he learns the truth, with all reasonable diligence to disaffirm the contract, or abandon the transaction, and give the other party an opportunity of rescinding it, and of restoring both of them to their original position. He is not allowed to go on and derive all possible benefits from the transaction, and then claim to be relieved from his own obligations by a rescission or a refusal to perform on his own part. If after discovering the untruth of the representations he conducts himself with reference to the transaction as though it were still subsisting and binding, he thereby waives all benefit of and relief from misrepresentations." Pom. Eq. Jur. § 897.

Judge Story says:

"In cases of alleged fraud in the sale of property, where the vendee seeks to defend against the securities, at law, or have them set aside by a court of equity, on the ground of fraud, it is incumbent upon him to interpose the objection at the earliest possible moment; and if, after he discovers the existence of the facts, which are claimed to constitute fraud, he continues to act under the contract, except for the mere purpose of preserving the property for the party ultimately entitled he will be held to have affirmed the contract, with full knowledge of all the facts." Story, Eq. Jur. § 1551.

In a case quite similar to the case at bar involving the question of fraudulent representations upon the sale of patents the supreme court of Illinois held that "it is not sufficient to allege that the patents are infringements upon others, and worthless, without showing that the complainants have ceased to use the patents or their right to use them has been questioned." Dillman v. Nadlehoffer, supra. Delay will defeat the right to relief if the fraud was known to the party alleged to be defrauded or ought to have been known by the exercise of ordinary diligence. After knowledge of the facts which will enable him to take effectual action he must disaffirm the contract with reasonable promptness. He cannot willfully shut his eyes and ears to what he might have known and ought to have known. If, after knowledge which would enable him to disaffirm, he deals with the property as his own, accepts advantages for himself and deprives the other party of the advantages of ownership he cannot afterwards rescind. The election to rescind or not to rescind, once made, is final and conclusive. Mining Co. v. Watrous, 9 C. C. A. 415, 61 Fed. 163, 186; Scheftel v. Hays, 7 C. C. A. 308, 58 Fed. 457; Pence v. Langdon, 99 U. S. 578; Rugan v. Sabin, 3 C. C. A. 578, 53 Fed. 415; Johnston v. Mining Co., 148 U. S. 360, 370, 13 Sup. Ct. 585.

Apply the rule to the case at bar. As soon as complainants knew that the contracts had been obtained by fraudulent repre-

sentations it was their duty promptly to rescind and return, or offer to return, the contracts and all benefits received thereunder. Assuming, for the moment, that fraudulent representations were made, when did the complainants learn of their falsity? The Hench and Dromgold harrow, upon which they chiefly rely to prove the fraud, was known to them in September, 1889. They also knew that Hench and Dromgold claimed to have a patent covering their harrow. This was but six months after the first contract and less than a month after the second. If the complainants had taken the least pains to follow up this information they would have learned all the important facts. Instead of doing so they wrote to the defendant and were informed by him that the Hench and Dromgold patent was "very weak." They say they relied upon the defendant's assurances. At this time the contract could have been rescinded without serious loss to the defendant and it may well be doubted whether the complainants, with this positive information before them, were justified in closing their eyes and resting in child-like confidence upon the statements of the one man in all the world who would be least likely to give them the desired knowledge. As was said in Scheftel v. Hays, 7 C. C. A. 308, 58 Fed. 457:

"The victim of a fraud, who has received notice enough to excite his attention and put him on his guard, cannot evade the duty of speedy and diligent inquiry by merely calling on the chief perpetrator, whose interest it is to conceal the facts, to reiterate or prove his false statements. * * * A diligent inquiry is an honest inquiry,—one reasonably calculated to discover, not to conceal the facts,—and an inquiry of the perpetrator of the fraud alone is one plainly calculated to conceal them."

From the autumn of 1889 until the winter of 1890 additional information came to the complainants from time to time which, upon their theory, was well calculated to put them upon inquiry. If, however, they still slumbered the letter of December 23, 1890, from the counsel for the National Harrow Company, must have been a rude awakening, for they were then informed, in brief, that defendant's patents were valueless. But assume that even this blunt declaration did not require the complainants to bestir themselves it certainly cannot be said that there was any excuse for inaction after June 18, 1891, for they admit that they then knew the substance of all the accusations against the La Dow patents. This was two years and three months from the date of the first contract, but it had yet three and a half years to run. At that time there was a meeting of the National Harrow Company for the purpose of apportioning its stock among the various members. A fierce attack was made upon these patents and substantially every argument was made against them that is now advanced. La Dow had commenced a suit against the complainants for royalties, the relations between them were strained and every consideration called upon the complainants if they intended to rescind the contracts to act promptly. Instead of withdrawing the contracts from arbitration, repudiating them upon the spot and denouncing La Dow as the perpetrator of a fraud they insisted that the contracts were of great value and covered the most useful harrow in the market.

The arbitrators, apparently, took this view, for the complainants were awarded $29,200 for these contracts and an interest in three other patents, apparently of little value, two of them being re-issues,—one having expired. This amount was shortly afterwards increased to $45,200 and the La Dow licenses, held in escrow, were delivered to the harrow company. In July, 1891, the complainants wrote to La Dow:

"We have assumed full responsibility for our contracts with you, i. e., in order to preserve peace and harmony with the National Harrow Co. we finally assumed the contract with you and relieved the National Harrow Co. from their agreements. [To pay royalties.]"

It might well be said, under the authorities cited, that here was an end of any attempt to rescind the contracts. With full knowledge of the fraud the complainants sold the contracts to the harrow company. But this is not all. On the 22d of October, 1891, the complainants served their answer in La Dow's suit for royalties. The defense was fraud, the allegations being substantially the same as those of the present bill. It was not possible to return the licenses at that time for they were held by the harrow company, but the answer contained no offer of restitution of any kind. The suit was tried in March, 1892, and a verdict directed for La Dow on the ground that Bement & Sons could not avoid a contract on the ground of fraud which they had sold for a valuable consideration to a third party who was still the owner. After this trial the complainants obtained a written instrument, signed by the president and secretary of the harrow company, reassigning the licenses to them. Thereafter, and before the commencement of this suit, in April, 1892, the complainants wrote the defendant a letter in which they offered to tender back the licenses "and all rights thereunder." This was the first and only tender. It was made three years after the date of the first license and ten months after the complainants, with admitted knowledge of the facts constituting the fraud, had ratified the licenses by selling them. It was then too late. But the tender was insufficient for other reasons. The complainants had enjoyed the sole use of defendant's patents for three years, they had sold the licenses for a large sum, $29,200 or $45,-200; they had kept on manufacturing the "Steel King" harrow in ever increasing numbers, even up to the commencement of this suit; they had received annual dividends upon their stock in the harrow company; but they did not tender to the defendant dividends, or profits, or avails of the sale, or offer to indemnify him for the three years which the licenses had cut out of each of his patents. They kept all the benefits which they had received from the transaction and offered nothing in return. The advantages received from the defendant were, in any view, of great value, and these it was incumbent upon them to give up. They cannot satisfy the demands of equity by retaining the substance and returning the shadow. The court does not overlook the attempt to show that the award of $45,200 was, in part at least, for the good will transferred by complainants to the harrow company. The evidence, oral and writ-

ten, is, however, overwhelmingly against this contention. Although something may have been allowed for the other interests alleged to have been previously transferred, it is clear that the award was based principally upon the La Dow licenses and that under the terms of the arbitration the question of good will could not have been considered. The assignment by the complainants to the harrow company of June 17, 1891, covers, apparently, only the La Dow licenses and patents, and there is nothing to show that any argument was made before the arbitrators based upon the other patents owned by the complainants. The amount received is, however, not material. Beyond question the complainants' received something for the licenses in question and have kept it to the present time. For the reason, then, that they have accepted and retained the benefits from the contracts and have failed to disaffirm them, after full knowledge of the facts, the complainants are not in a position to recover. It follows that the bill must be dismissed.