TOOKER et al. v. ALSTON.

(Circuit Court of Appeals, Eighth Circuit. December 21, 1907.)

No. 2,523.

1. Fraud—Action for Fraud and Deceit—Sufficiency of Evidence.
   Evidence that defendants falsely represented to plaintiff that there was a solid ore body under a tract of land on which they, with another, owned a mining lease, when in fact it had previously been mined until abandoned as practically worked out, and that they concealed an opening into the old workings, and by such means induced plaintiff to buy the interest of their co-owner and a part of the interest of one of defendants in the lease, which was practically worthless, was sufficient to sustain a verdict for plaintiff in an action for fraud and deceit.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 23, Fraud, § 8.]

2. Same—Deception Constituting Fraud—Duty to Investigate.
   The rule that a purchaser of property is bound to avail himself of the ordinary means of information to ascertain the character and value of the property, and that, if he does not, he cannot recover because of misrepresentations made by the seller, cannot be invoked by one whose active fraud prevented the making of such inquiries or investigation.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 23, Fraud, § 21.]

**3. DAMAGES—ACTIONS FOR FRAUD AND DECEIT—MEASURE OF DAMAGES.**

The measure of damages recoverable in an action for fraud and deceit by which plaintiff was induced to buy property is the difference between the price paid for the property and its value at the time he bought it.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 23, Fraud, §§ 60–62.]

**4. FRAUD—RELIANCE ON REPRESENTATIONS.**

In an action for fraud and deceit inducing a purchase of property, it is not a defense that plaintiff made other investigation and inquiry respecting the property, if the fraudulent conduct of defendant was a material, although not the sole, inducement to the purchase.

**5. SAME—EVIDENCE—FALSE REPRESENTATIONS TO OTHERS.**

In an action for fraud and deceit in inducing plaintiff to buy property by false representations as to its character and value, evidence that defendants made similar representations to others to induce them to purchase is relevant and material.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 23, Fraud, § 50.]

Sanborn, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Southwestern Division of the Western District of Missouri.

This was an action by W. W. Alston to recover damages from L. A. Tooker, D. B. Loy, and C. A. Reed for their fraud and deceit in inducing him to purchase interests in a mining lease. A trial to a jury resulted in a verdict and judgment for $6,500 against Tooker and Loy, who for convenience will be referred to in the opinion as the "defendants." There was no evidence that Reed participated in the conduct complained of, and the jury found in his favor. Tooker and Loy seek a reversal of the judgment against them. Attention will be confined to the ten assignments of error, though their brief takes a wider range and questions are argued that do not properly arise.

H. H. Bloss (I. V. McPherson, on the brief), for plaintiffs in error.

J. L. McNatt (A. E. Spencer and R. E. Scofield, on the brief), for defendant in error.

Before SANBORN and HOOK, Circuit Judges, and PHILIPS, District Judge.

HOOK, Circuit Judge (after stating the facts as above). The denial of defendants' request for a directed verdict in their favor is presented by the first assignment of error, and the question is whether the verdict against them is sufficiently supported by the evidence. There was substantial evidence of the following facts:

The Boston-Aurora Zinc Company, a Maine corporation, as the owner of 10 acres of land in southwest Missouri, executed a mining lease thereof, dated November 18, 1904, to Tooker, Loy, and Reed. It required the immediate commencement and continuance of mining operations in a minerlike manner and in good faith, the installation on the premises within 90 days of a 100-ton concentrating plant, which should remain thereon and be operated, and the payment of a royalty of 15 per cent. Subject to these requirements and their continued observance, the lease ran for 10 years. It became effective May 13, 1905. Some years before there had been extensive mining operations on the leased ground at a depth of 120 feet below the surface, in part by means of a drift from adjoining property, and in part by a shaft or shafts on the leased ground, penetrating the drift. A large area had been mined and the valuable ore extracted. The old drift was

about 40 feet wide and from 25 to 40 feet in height. With the exception presently to be mentioned the mining operations had ceased about 5 years before the transactions between plaintiff and defendants, the mine had been abandoned as worked out, and the machinery and mining structures removed. In one place in the old drift, where it was about 40 feet in height, some mineral of value had been left in the roof and in a leg supporting the roof. The roof at this point was about 80 feet from the surface of the ground.

Within the year preceding the transactions involved in this case a couple of miners sunk a shaft, the bottom of which, being about 80 feet from the surface, penetrated this mineral. The rights they had, though it does not appear what they were, were sold to Tooker and Loy. From the bottom of the new shaft a drift was driven, resulting in the formation of a small chamber. During these operations the floor at the bottom of the shaft broke through into the old abandoned drift; the opening being about 3 feet in diameter. When defendants obtained the lease in November, 1904, they cast about to find a purchaser, and to make their proposition attractive it was necessary for them either to conceal the existence of the former mining operations or to minimize their extent and prevent those solicited to purchase from learning that in fact the ground had long since been practically abandoned for mining purposes. To this end the opening from the bottom of the new shaft into the old drift was concealed by boards upon which earth and mineral were thrown. It was represented that the new shaft was in virgin ground, in undeveloped territory, and therefore that the mine was of exceeding richness, requiring years to exhaust. Not far from the top of the new shaft a considerable area of the surface, about 100 by 150 feet, had sunk because of the withdrawal of support in the abandoned workings. The extent of this depression was so considerable it became necessary to account for it, and it was represented to be a "blow-out," a condition not infrequent in that mining country. A blow-out was understood to be due to natural causes, and not to subterranean mining operations. Among those upon whom these and other devices were practiced, and to whom the misrepresentations were made, was the plaintiff, a citizen of North Carolina, who as a traveling salesman visited the town in which defendants resided, and near which the mine was located, in January, 1905. The plaintiff was without experience and wholly unfamiliar with mines and mining operations.

An agent of defendants, who says he was similarly deceived by them, engaged him in conversation, spoke of defendants' mine, extolled its value, and introduced him to Tooker, who in turn induced him to visit the premises. Shortly before their arrival the son of Tooker, who was at the surface, shook the rope, and, having attracted the attention of the two workmen who were in the old drift, told them that his father had telephoned he was going to bring a man to look at the mine, and for them to come up into the new shaft and fix it up. One of these men testified that this was the agreed plan, and that they were working there merely for the purpose of keeping the lease alive; that the defendants said they desired to sell, and not to work, the mine. The two workmen came up, placed the boards over the opening, and scattered

some earth around the edges. They washed the walls off with water
to give the ore an attractive appearance. Shortly afterwards the plain-
tiff went down the shaft, accompanied by the superintendent of an
adjoining mine, to whom Tooker had introduced him. Tooker re-
mained on the surface, as was his course on other occasions when he
took prospective purchasers there. The superintendent said: "It just
looks bully. It is just dandy—a bully good mine, or looks like it."
When they returned to the surface, plaintiff asked him his opinion,
and he replied: "It is a fine thing, if it is in solid ground." Tooker
thereupon replied, "There is no question about it. It is in solid
ground." Whilst plaintiff was in the town Tooker so attended him
that he had little opportunity to secure disinterested advice. Tooker
was more active than Loy; but the latter was cognizant of what was
being done and assisted when occasion required.

Various misrepresentations were made of the richness of the mine, its
value, and what could be done with it, for which, if alone regarded,
an action might not have been maintained (Sawyer v. Prickett, 19
Wall. 146, 22 L. Ed. 105; Gordon v. Butler, 105 U. S. 553, 26 L. Ed.
1166; Union Pacific v. Barnes, 12 C. C. A. 48, 64 Fed. 80; Kimber v.
Young, 70 C. C. A. 178, 137 Fed. 744); but they are adverted to here
for their relevancy to the entire transaction. They represented to
plaintiff that Reed was a farmer living 25 miles distant in the country;
that he was an undesirable partner, because he would not assist in put-
ting up the mill required by the lease; and that his third interest could
be bought for $4,000. Plaintiff was dissuaded from visiting Reed and
trying to buy for a less sum. They also represented that they could
incorporate, and that the property would stand a large capitalization.
Finally plaintiff purchased the Reed interest, paying Loy, who assumed
to act for Reed, $4,000 for it. The plaintiff then left, and did not re-
turn until April. During his absence Loy wrote him that he had put
a price of $25,000 on the property. Plaintiff wired in reply his inter-
est was not for sale. When he returned Loy refused to incorporate,
and Tooker proposed to plaintiff that they buy Loy out. This was
done, and plaintiff paid Loy $4,000 for two-thirds of his third inter-
est; it being understood that Tooker purchased the remainder of Loy's
interest at the same rate.

Though the bill of sale to plaintiff and Tooker recited the payment of
$6,000, it is questionable whether Tooker's purchase was genuine, since
at the time of the trial Loy appears to be still associated with Tooker
in control of the property. Neither of them testified at the trial, and
their versions of the transactions do not appear. Probably part of the
$4,000 paid by plaintiff was for Loy's interest in an old mill bought
and removed to the leased ground; but it appeared that as the result
of both transactions plaintiff paid at least $7,000 for a five-ninths in-
terest in the mining lease. There was also substantial evidence that
the leasehold interest was practically worthless. The life of the lease
depended upon continued mining operations conducted in a minerlike
manner and in good faith, and also upon the continued maintenance
and operation of a 100-ton concentrating plant on the premises. It is
not as though plaintiff's interest were in the land itself, in which event
he might safely await the invention of new processes for the profitable

reduction of low-grade ores or await discoveries of other veins of mineral in the ground. There was proof that the mine had been abandoned as worked out and no longer profitable, and that the mining, upon the results of which defendants relied, was the removal of mineral left in the old workings to support the roof. After a year's experience the most favorable showing of defendants was that the mine was "holding about even." It appeared, however, that they were in debt, and some of their bills were four or five months past due. The plaintiff, relying on what was said and done by defendants, suffered a loss of the difference between what he paid and the value of what he got at the time he got it. Sigafus v. Porter, 179 U. S. 116, 21 Sup. Ct. 34, 45 L. Ed. 113; Smith v. Bolles, 132 U. S. 125, 10 Sup. Ct. 39, 33 L. Ed. 279. It was also shown that defendants, shortly before meeting plaintiff, attempted to deceive two other men, Stone and Moulton, by the same devices, but failed.

In conclusion: There was substantial proof that defendants fraudulently concealed and disguised the physical condition of the property in question; that, having done so, they made false statements, not promissory in character, nor of mere opinion, but as to existing facts within their knowledge, of which plaintiff was ignorant; that the statements were material, and were made with intent that plaintiff should rely thereon and be deceived; that plaintiff did rely thereon, and was deceived into paying over $7,000 for that which was of little or no value. Under familiar rules of law, such proof required submission of the case to the jury, and was sufficient to uphold their verdict for the plaintiff. There were evidences upon the surface of the ground of prior mining operations, which, had they been pursued by plaintiff, would have led to knowledge of the real condition of the property. The general rule is that a purchaser must exercise common prudence, and if he fails to avail himself of the ordinary means of information the law gives him no redress. Andrus v. St. Louis Smelting Co., 130 U. S. 643, 9 Sup. Ct. 645, 32 L. Ed. 1054. But defendants cannot invoke this rule, because of their active efforts to conceal the condition of the mine, to thwart investigation and inquiry, and in misrepresenting the significance of conditions that were apparent. Such conduct brings the case within the salutary exception designed to avoid encouragement to fraudulent and deceitful practices. Strand v. Griffith, 38 C. C. A. 444, 97 Fed. 854; Henderson v. Henshall, 4 C. C. A. 357, 54 Fed. 320. See, also, Stewart v. Wyoming Ranche Co., 128 U. S. 383, 9 Sup. Ct. 101, 32 L. Ed. 439. It was no defense that part of what plaintiff was induced to purchase by defendants' fraud and deceit belonged to another party. Sigafus v. Porter, 28 C. C. A. 443, 84 Fed. 430.

The next four assignments of error relate to the refusal of the trial court to give certain instructions requested by defendants. The instruction set forth in the first of these was fully embodied in the general charge. The court was not required to repeat it, or to give it in the language of counsel. By the instruction in the next one counsel sought the declaration of a rule that if the plaintiff made an investigation himself, and consulted with others as to the condition of the mine or its value, there is a presumption of law that he acted

upon information so gained, and not upon the representations of defendants. There is no such presumption of law. In Sioux Nat. Bank v. Norfolk State Bank, 5 C. C. A. 448, 56 Fed. 139, this court held that it was not a defense that plaintiff also made some other examinations and inquiries, if the conduct of defendants was a material, though not the sole, inducement to the transaction in question. In the case at bar the trial court charged the jury that it was incumbent upon the plaintiff to show that he relied upon defendants' representations, believed them to be true, and, so believing, acted thereon. In another the instruction asked and refused was that the jury should find for defendants unless it appeared that the mine was worthless. Obviously this is not the law. The instruction set forth in the fifth assignment was that the jury should "disregard the testimony set out in the deposition of John B. Stone." This, also, was rightly refused. It was not denied that the deposition was properly taken upon sufficient notice. The real point of defendants' objection was that Stone was allowed to testify that, shortly before the transaction with plaintiff, defendants attempted to induce him to purchase an interest in the lease, and in doing so made the same representations and used the same devices for concealment, which he described. Without considering other reasons for sustaining the action of the court, it is sufficient to say that Stone's testimony was relevant and material. Exchange Bank v. Moss, 79 C. C. A. 278, 149 Fed. 340, and cases there cited.

In view of familiar and oft-repeated rules of practice, needing no citation of the authorities, the remaining five assignments of error may be disposed of by describing them briefly. The sixth assignment challenges as an entirety a substantial part of the court's charge, embracing different rules applicable to different phases of the case. The seventh is as follows:

"The court erred in the entire charge to the jury, and for purposes of abbreviation it will not be copied in this assignment of errors."

In the eighth, complaint is made in general terms of the admission of the testimony of three witnesses upon various subjects. In the ninth, it is said that the court erred in entering judgment on the verdict in favor of plaintiff, when by the law of the land the judgment ought to have been for the defendants. And the tenth is that the court erred in overruling defendants' motion for a new trial.

The judgment is affirmed.

SANBORN, Circuit Judge (dissenting). My understanding of the facts and of the law of this case, briefly stated below, is such that I am unable to concur in the opinion of the majority. The only averments in the complaint of actionable misrepresentations were (1) that the new shaft was sunk in virgin or undeveloped ground; (2) that the ore in the sides and bottom thereof would easily run 10 per cent.; and (3) that this ore would continue on downward for at least 40 feet, growing better under normal conditions. There was no substantial evidence that the third alleged misrepresentation was ever made. There was no substantial evidence that the second alleged misrepresentation was false. The undisputed evidence was that

the new shaft was in virgin undeveloped ground to its full depth, which was about 80 feet, but that there was a hole in the bottom of it into the old drift beneath, and that this hole had been covered with planks and earth when the plaintiff inspected it. The undisputed evidence was that he knew, before he inspected the shaft and before he bought this property, that there had been a mill upon it, and that a run of ore beneath the 80 feet, through which the new shaft was sunk, 40 feet in height, across this land at the 120-foot level, had been worked out. The old shaft was about 80 feet distant from the new shaft, and he had seen this upon the ground, and the cave-in, the edge of which was within a few feet of the new shaft. He testified, and this portion of his testimony was not contradicted:

"Q. You stated in your direct examination that one of these 'runs,' as you call it, northeast and southwest, across there had been worked out—one of these runs of ore? A. Yes, sir; that was 40 feet or so. Q. Who told you that? A. L. A. Tooker. Q. Tooker told you that the run had been worked out? A. Yes, sir; Tooker and his son both told me that first, in the beginning, and Loy, too, because when we went up town I always met him and told what I had seen, and what had been said and represented. It was more than natural, I suppose, I went to tell them parties, and we were partners— Q. Just answer the questions. Then you knew, from what Mr. Tooker told you, there had been a run there worked out through that ground below there—you knew that? A. Yes, sir; he told me there was $25,000 taken out of there. It run direct 40 feet, too. Q. How deep was that run of ore through that ground? A. I don't know, only just what he claimed. Q. I am asking what he claimed? A. That it was, well, 80 feet ores here, and then it was 40 feet more. Q. Below that? A. Yes, sir; that would be 120 feet. Q. Then the run of ore he claimed was 120 feet? A. Yes, sir; 120 feet, I suppose. That is my best recollection it is that; but there is mud in it 12 or 15 feet there."

He was not a stranger in Joplin, where this land was situated. He had been selling whips to customers in that town and visiting it yearly for several years. Before he made his first purchase he inquired of his customers about the defendants, and took the manager of an adjoining mine down into the new shaft, and inquired of him about this mine and about the one which adjoined it. With all this knowledge he bought one-third of the lease in January, 1905, and paid $4,000 for it. The plaintiff bought subject to the rule, "Caveat emptor." Notice of facts and circumstances sufficient to put a reasonably prudent person upon inquiry is notice of all the facts which a diligent inquiry would have disclosed. The facts that there had been a mill upon this property, which had been removed; that there was an old shaft, and a cave-in upon it; that the new shaft was sunk but 80 feet; that $25,000 had been taken from a run of ore in this land below the 80-foot level; and that that run had been worked out—constituted ample notice of the extent and character of the old workings, because it was such notice as would have inspired an ordinarily prudent man to investigate and learn their extent and character; and hence it estopped the plaintiff from asserting any damage from the alleged misrepresentations about them, and threw the risk of them upon him, because his failure to learn them was the result of his own failure to comply with the rule, "Caveat emptor." The purchaser assumes the risk of defects in the article bought of which he has, or by reasonable diligence may obtain knowledge.

In April, 1905, about three months after the first purchase, the plaintiff and Tooker bought another third of this property for $6,000. The plaintiff bought and paid for two-thirds of this third, and Tooker bought and paid for one-third of it. The only averment of any additional misrepresentation made to induce this second purchase was that Tooker falsely pretended to buy his third; but the record is barren of evidence that he did not actually purchase it. The bill of sale ran to Alston and Tooker. Alston and Tooker both made the note for $2,667 in part payment of the purchase price.

There is another significant fact, which should not be overlooked in the determination of this case. This was not a sale of a lease of a barren mine. The evidence established the fact that, after Alston purchased, ore of the value of $19,000 was taken out of the mine before the trial. It is true that there was evidence that the mining operation had been holding about even, counting expenses and product; but there was uncontradicted evidence that the owners were still operating the mine, that at the time of the trial they had 100 tons of paying ore broken down and were working upon a face of good mineral, 25 feet high and 12 to 20 feet wide. When the plaintiff purchased, he thought the lease was worth from $12,000 to $18,000; but it was a lease of a mine, and its value was necessarily unknown. It could be determined only by a thorough exploration of the land, by subsequent prospecting or working. The subsequent work demonstrated that there was $19,000 worth of ore in the mine when he purchased his interest in the lease. The remaining value in it is still unknown, because valuable ore is in sight and still remains to be removed. The burden was upon the plaintiff to prove that the lease was worth less than $12,000 or $18,000, and how much less; and there seems to me to be no sufficient evidence of the plaintiff's damage, if he suffered any.

In view of the indisputable facts that Alston knew that there had been a run of ore worked out upon the 120-foot level, beneath the 80-foot level within which the new shaft was sunk, from which $25,000 worth of ore had been taken from this land, and that there had been an old shaft upon it, which he saw before he purchased, it seems to me that there was no substantial evidence in this case to sustain a verdict in his favor in the light of the decisions of the Supreme Court in Slaughter's Administrator v. Gerson, 13 Wall. 379, 384, 385, 20 L. Ed. 627; Southern Development Company v. Silva, 125 U. S. 247, 252, 8 Sup. Ct. 881, 31 L. Ed. 678; Farnsworth v. Duffner, 142 U. S. 43, 48, 12 Sup. Ct. 164, 35 L. Ed. 931; Shappirio v. Goldberg, 192 U. S. 232, 241, 24 Sup. Ct. 259, 48 L. Ed. 419.

2. There was substantial evidence that the plaintiff made an independent investigation of the character, condition, and value of the mine before he bought his interest in the lease upon it, and the court refused to charge the jury in response to the request of counsel for the defendants that, if they believed that the plaintiff made such an independent investigation and that the defendants made false representations to him before the purchase, the law presumes that he acted upon the results of his independent investigation, and not upon the misrepresentations of the defendants, and that if he acted upon the former they must find for the defendants. It is true, as the majority of the court

suggests, and as we held in Sioux Nat. Bank v. Norfolk State Bank, 56 Fed. 139, 5 C. C. A. 448, that if a false representation is a material, but not the sole, inducement to a contract or transaction, the party injured may sometimes maintain an action upon it; but that is not the question which the request of the counsel for the defendants presented here. That question was whether, when there have been false representations and an independent investigation before a purchase, the legal presumption is that the buyer acted upon the false representations or upon his own investigation. There is no doubt that if he acted solely upon his own investigation he could not recover from the party who made the false representations. Proof that the false representations induced the purchase is essential to a right of recovery. The question seems to be susceptible of but one true answer. The false representations and action induced by them are each essential elements of an alleged fraud. Fraud is never presumed. The legal presumption always is that a fraud and the elements of it do not exist until each of them is clearly proved. On the other hand, there is no wrong or fraud in an independent investigation by a purchaser and his action thereon. That is the course which the rule, "Caveat emptor," requires the purchaser to pursue, and it is the natural and customary method followed by buyers of reasonable prudence. The logical, and to my mind the inevitable, result is that where there have been false representations, and an independent investigation by a purchaser, the legal presumption is that he acted upon his own investigation, and not upon the false representations, and that if he did so in this case the defendants were not liable. The refusal to give this charge seems to me to have been fatal error. Anderson v. McPike, 86 Mo. 293, 300; Farrar v. Churchill, 135 U. S. 609, 615, 10 Sup. Ct. 771, 34 L. Ed. 246, and the authorities from the Supreme Court cited supra; E. Bement & Sons v. La Dow (C. C.) 66 Fed. 185, 188; Billings v. Aspen Mining & Smelting Co., 51 Fed. 338, 348, 2 C. C. A. 252; Fauntleroy v. Wilcox, 80 Ill. 477, 480.

3. The testimony of John B. Stone was, in my opinion, immaterial and prejudicial to the defendants, and the court should have stricken his deposition from the record. The evidence he gave detailed statements made to him by the defendant Tooker in November, 1904, in an attempt either to sell an interest in the lease to him or to induce him to sell it for the defendants; but the only material statement made to him, which was proved to be false, was that there had been no mining in the land below the level of the bottom of the new shaft, and this testimony was immaterial in this suit, because no such false representation was made to Alston, but, on the other hand, Tooker told him that the run of ore below the 80-foot level had been worked, and $25,000 worth of ore had been taken from it before Alston made his purchase. The other statements of the defendants which Stone recited were immaterial, because they were not proved to be untrue, and because they were not calculated to deceive, and did not deceive him. His entire testimony was, in my opinion, the relation of a transaction between other parties than the plaintiff, hearsay and immaterial.

For these reasons I think the judgment ought to be reversed, and that a new trial should be granted.