DANIELS v. BENEDICT et al.

(Circuit Court of Appeals, Eighth Circuit. October 16, 1899.)

No. 1,206.

1. CONTRACTS—PRESUMPTION OF VALIDITY.
Contracts between parties in confidential relations, which do not themselves disclose any injustice or inequity, are presumed to be valid.

2. HUSBAND AND WIFE—AGREEMENT FOR SEPARATION.
An agreement of separation between a husband and wife, resident in Colorado, where by statute the wife has the same property rights and right to contract as though unmarried, is presumptively valid; and a party pleading it as a cause of action or matter of defense need not aver or prove that it was fair and just to the wife.

3. SAME—VALIDITY.
It is the settled law of both England and the United States that an agreement of separation between a husband and wife, whereby he provides for her separate maintenance, and she covenants to release all her claims upon his estate, is lawful, and not in contravention of public policy.

4. EQUITY PLEADING—ISSUES AND PROOF.
A complainant, by failing to set down a plea for argument, and by filing a general replication thereto and going to hearing on the issue thus made, admits the legal sufficiency of the plea; and, if the facts pleaded are established on the hearing, the defendant is entitled to a dismissal of the bill.

5. HUSBAND AND WIFE—AGREEMENT OF SEPARATION—TRUSTEE UNNECESSARY.
The intervention of a trustee is not essential to the validity of an agreement of separation between husband and wife. A contract of this character, to which the husband and wife are the sole parties, is valid under the statutes of Colorado, both at law and in equity, and it is enforceable in equity under the common law.

6. SAME—ABROGATION OF AGREEMENT—SUBSEQUENT COHABITATION.
Subsequent cohabitation does not abrogate an agreement of separation between a husband and wife, unless such is the intention. Where an agreement expressly provided that it should remain in force although the parties should again come together and live as husband and wife, occasional visits and cohabitation cannot be considered as establishing such an intention.

7. SAME—TERMS OF AGREEMENT.
A provision in an agreement of separation that, in case the parties should again come together and live as husband and wife, it should in no way abrogate or modify the agreement as to their property rights, beyond entitling the wife to her support from the husband, is not immoral or against public policy.

8. SAME—COLORADO STATUTE.
The provision of the Colorado statute (Mills' Ann. St. Colo. §§ 3010, 3011) that a husband may not by will deprive his wife of more than one-

half his property, unless she accepts the conditions of the will after his death, does not evidence a public policy which would render invalid a property settlement made in an agreement of separation. The inhibition of the statute is limited to disposition by will. It leaves all parties full power of disposition by contract or conveyance.

9. SAME—RELEASE BY WIFE OF INTEREST IN HUSBAND'S ESTATE.

It is no objection to the validity of a covenant by a wife in an agreement of separation to release all claim to her husband's estate on his death, in consideration of the present conveyance to her of property by the husband, that her interest in his estate is a mere expectancy; and, where the agreement has been fully executed by the husband, such covenant is valid and enforceable against the wife.

10. SAME—GROUNDS FOR SEPARATION AGREEMENT.

The cause or reason for the making of an agreement of separation between a husband and wife is for their own consideration exclusively, and the courts cannot inquire into its sufficiency, as affecting the validity of the agreement.

11. SAME—FRAUD IN PROCURING AGREEMENT OF SEPARATION.

Fraud on the part of a husband in procuring the execution by the wife of an agreement of separation cannot be predicated on the fact that during the negotiations for the agreement he wrote letters to his wife in which he expressed the hope and expectancy that they would soon be living together again, where there were no misrepresentations of existing facts.

12. SAME.

Where it appears that the lawyer who acted for a wife in making an agreement of separation conducted the negotiation in her behalf in good faith, and with ability and success, obtaining for her a substantially larger allowance than she had previously offered to accept, the facts that he had previously been counsel for the husband, and was called by the husband to a conference between himself and wife, and, on his declining to act for both, was released from his retainer by the husband, that he might be employed by the wife, or that, in accordance with express provisions of the agreement, his fee was paid by the husband, where all such facts were known to the wife, do not constitute any ground for impeachment of the agreement.

13. SAME—REASONABLENESS OF SETTLEMENT.

A husband and wife, after living together less than seven months, made an agreement of separation, by which the husband gave the wife money and property of the value of $75,000, and each released all claims upon the estate of the other. There were no children of the marriage. The husband was worth $700,000, but no part of his property was received from his wife. Under the statutes of the state, the wife would have been entitled, on the death of her husband, to one-half his estate. *Held*, that such agreement could not be considered inequitable or unjust or unfair to the wife.

14. SAME—EXECUTED AGREEMENT OF SEPARATION.

Courts of equity sometimes enforce the specific performance of a contract, but they never undo the accepted execution of a lawful agreement. Where a wife voluntarily and advisedly entered into an agreement of separation with her husband, and accepted and retained the property conveyed to her by her husband in execution of such agreement, and lived apart from him during the remainder of his life, a court of equity will not, after his death, set aside such agreement, and restore her to the rights in his estate which she surrendered for those considerations.

Appeal from the Circuit Court of the United States for the District of Colorado.

T. J. O'Donnell and Hugh Butler, for appellant.

T. M. Patterson and Joel F. Vaile (Edward O. Wolcott, on the brief), for appellees.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge. This is a suit by a divorced wife to recover from the devisees under the will of her former husband one-half of the property of which he died seised. Under the statutes of Colorado, one-half of the real and personal property of a deceased husband and father descends to his widow, and the other half to his surviving children. The husband may not take away from his wife her share of his estate by a will, nor can she deprive herself of her right to claim this share by consenting before the death of her husband to a will which bequeaths it elsewhere. Mills' Ann. St. Colo. §§ 1524, 3011. The appellant, Lilyon B. Daniels, exhibited her bill in equity in this case to set aside her divorce, for fraud, and to recover one-half of the estate which her deceased husband possessed when he died. It was met by an answer which denied the fraud in the procurement of the divorce, by a plea of an agreement of separation by which she covenanted never to claim any interest in her husband's estate, and by a plea of the statute of limitations. A general replication was filed to the answer and to the pleas, and upon the final hearing of the case the circuit court held that the agreement of separation and the decree of divorce constituted good defenses to the suit, and dismissed the bill. This decree is challenged by the appeal, and we will first consider the objections of the appellant to the sufficiency of the defense based upon the agreement of separation.

It is said that this contract constitutes no defense to this suit, because the burden was upon the appellees to show, by evidence outside of the agreement itself, that its terms were equitable, just, and fair to the appellant, in view of the value of the property of her husband, and of all the surrounding circumstances when the contract was made, and that they neither pleaded nor proved any facts which sustained this burden. To this contention there are two answers. They are that no such burden rested upon the appellees, and that by the course of her pleading the appellant conceded this to be the law. The argument of counsel for appellant in support of their proposition is that husband and wife occupy a fiduciary relation to each other, and that contracts between them are consequently presumptively void until they are proved to be valid. If all contracts between those in confidential relations to each other were presumptively fraudulent and void, the conclusion might be justified, but they are not, and hence the argument fails. Some contracts between parties in fiduciary relations to each other are valid, and some are voidable or void, and some contracts between strangers are valid, and some are void; so that no definite conclusion can be drawn as to the validity or invalidity of a contract from the fact that the parties to it occupied a fiduciary relation to each other. It will not do to say that all contracts between husbands and wives, between fathers and daughters, between principals and agents, and between others in similar relations, are ineffectual until proved aliunde to be just and fair, because the effect of such a rule would be to practically disable parties occupying such relations from making contracts with each other. Agreements between parties in these relations are either presumptively valid or pre-

97 F.—24

sumptively void. If the former, then the power of such parties to bargain, trade, and agree with each other is plenary. If the latter, then their power to contract with each other is practically destroyed. No principle of equity, no rule of law or of morals, which occurs to us, requires a decision that the confidential and fiduciary relations of life disable all who enter them from making agreements with each other, or stamp their mutual contracts with the presumption of fraud or invalidity. Such a presumption is unfounded in fact, and runs counter to the common knowledge and experience of men. Cases may indeed be found in the books in which a husband, a wife, a son, or a daughter has become so lost to all considerations of honesty, honor, duty, or affection as to take an unconscionable advantage of a wife, a husband, or an infirm father by means of a contract. But these cases are rare exceptions to the general rule of life and of business. The vast majority of customary contracts between members of families, between principals and agents, between trustees and cestuis que trustent, and between others in like relations, by which property is divided, transferred, sold, and conveyed, and the various business relations of the parties are fixed, are not read in the books, because they are made in good faith, are fair and equitable, and are performed with satisfaction and pleasure. Men are at least as honest, just, and liberal in their contracts with their wives, with their children, and with others to whom they sustain confidential relations, as they are in their agreements with strangers. We do not question the settled rule that when one takes advantage of a fiduciary relation to make a contract with a person who trusts him, which the latter alleges to be unjust or inequitable, the charge will be investigated by the courts with searching scrutiny, that they will guard the rights of the confiding with jealous care, and that they will refuse to enforce the agreement if the proof sustains the charge. But they will not stamp the great multitude of fair contracts that are made between those in confidential relations with each other with the presumption of fraud and invalidity, and thus inject doubt and suspicion into the dearest and most intimate relations of life, because an occasional husband, wife, son, or daughter proves faithless, unscrupulous, or dishonest. A contract may indeed be so unjust, inequitable, or inconsistent with the duty of a trustee, on its face,—as when an agent to sell makes a contract with himself as purchaser, or a trustee obtains an inequitable agreement with his cestui que trust,—that it is presumptively voidable or void. But the general rule is that the existence of a fiduciary relation between the parties to an agreement does not disable them from making the contract, and does not render their agreement presumptively fraudulent or void. Contracts between parties in confidential relations which do not themselves disclose any injustice or inequity are presumed to be valid until they are proved to be fraudulent or unfair, and they are not presumed to be fraudulent and void until they are proved to be just and equitable.

We have not failed to carefully peruse and consider, before reaching this conclusion, the authorities which have been cited by coun-

sel for the appellant in support of their proposition that if an agreement of separation is relied on in pleading, either as a cause of action or as a matter in defense, the pleading must contain averments which show the contract to have been fair, just, and reasonable to the wife, and that a plea of the naked contract is insufficient: Garver v. Miller, 16 Ohio St. 528; Ireland v. Ireland, 43 N. J. Eq. 311, 12 Atl. 184; Boyd v. De La Montagnie, 73 N. Y. 498; Pierce v. Pierce, 71 N. Y. 154; Graham v. Graham, 143 N. Y. 573, 38 N. E. 722; Rogers v. Marshall (C. C.) 13 Fed. 60. But all these cases, except Garver v. Miller and Ireland v. Ireland, were decisions after the final hearing, in which it was affirmatively found that the agreements were obtained by fraudulent representations, and hence the general statements in the opinions in those cases that the burden was on him who would sustain them were mere obiter dicta. The cases of Garver v. Miller and Ireland v. Ireland fairly sustain the proposition of counsel, but they rest upon a presumption whose existence cannot be conceded in the case at bar,—upon the presumption that the wife was under the control of the husband when the contract was made. Thus, in Ireland v. Ireland the court said, "The wife is presumed to be sub potestate viri, and the affirmative is with the husband to show that the contract was fair, open, reasonable, and well understood." This presumption, and the general rule of pleading derived from it in these cases, is a deduction from the condition and disabilities of the wife under the common law. Under that law she was absolutely under the control of her husband, and without his consent she could neither act nor contract with reference to any right of property. During marriage the legal existence of the woman was suspended, or incorporated and consolidated with that of her husband. Whatever property belonged to her while single, or came to her while covert, passed absolutely to her husband, or fell under his dominion. She could possess nothing to her separate use; she could alienate nothing during her life, and she could bequeath nothing at her death; she could make no contract; and she could bring no suit. 1 Cooley, Bl. pp. 443, 444. The presumption that the wife was under the control of the husband was certainly in accordance with the fact, under such a law; and, while the statutes of the states of New York and New Jersey had greatly modified the common law when the decisions we are considering were rendered, still the presumption and the rule of pleading announced in those cases were derived from the condition of the wife under the common law, and were merely repeated and applied to the pleas then in question. In the case at bar, however, the appellant was in no such condition, when she made her agreement, as the wife under the common law. Her acts and rights were governed by the laws of the state of Colorado, where her contract was made, and under those laws no legal presumption can exist that she was sub potestate viri when she made her agreement, because such a presumption would fly in the teeth of the plain provisions of the statutes. They provided that marriage was a civil contract (Mills' Ann. St. Colo. § 2988); that the property of a married woman at the time of her marriage should

remain her separate property, free from the debts and the disposal of her husband (section 3007); that she could make any contract concerning, and could sell and convey, her personal property as if she were sole (section 3008); that she could carry on any trade or business as if she were unmarried, and that her earnings therefrom, and for her services, should be her sole and separate property (section 3012); that the separate deed of her husband should convey no interest in her lands (section 3017); that she could bargain, sell, and convey her real and personal property, and enter into any contract with reference to the same as if she were sole (section 3019); that she could sue and be sued in all matters as if she were unmarried (section 3020); and that she could enter into any contract as if she were sole (section 3021). Under these statutes the supreme court of Colorado has uniformly held that a married woman is no longer sub potestate viri in that state, and that contracts and conveyances between husband and wife are presumptively valid and effectual, without proof aliunde of their equity or justice. Wells v. Caywood, 3 Colo. 487, 493, 496; Kellogg v. Kellogg, 21 Colo. 181, 183, 40 Pac. 358; O'Connell v. Taney, 16 Colo. 353, 357, 27 Pac. 888. The result is that the fact that the parties to the agreement of separation occupied the confidential relation of husband and wife did not render it presumptively void, and did not cast upon the appellees the burden of pleading or proving that it was just and fair to the appellant. Com. v. Richards, 131 Pa. St. 209, 220, 18 Atl. 1007.

The contract of separation, therefore, like agreements between strangers, was valid and binding, unless it was illegal, immoral, or violative of public policy. There is certainly nothing illegal in an agreement for a husband and wife to live separate and to divide their property. There is no moral turpitude in such a contract, nor can it be said at this day to be otherwise than in accord with the public policy of England and the United States. Under the laws of the English-speaking nations, marriage is a civil contract, and not a sacrament. Many reasons suggest themselves to the thoughtful mind why a wise and enlightened public policy should encourage and enforce voluntary agreements of separation between husbands and wives whose wranglings, quarrels, and domestic infelicities have rendered their homes places of torment to themselves, and of discontent and misery for their children. We refrain from reciting these reasons here, because the public policy of a, nation or of a state is not to be sought in the opinions of individual judges, or through a consideration of the better reasons, but must be ascertained by a comprehensive view of its laws and judicial decisions relative to the subject-matter in question. U. S. v. Trans-Missouri Freight Ass'n, 19 U. S. App. 36, 54, 7 C. C. A. 15, 23, and 58 Fed. 58, 67; Vidal v. Girard's Ex'r, 2 How. 126, 197; Swann v. Swann (C. C.) 21 Fed. 299. When the legislation of the nations is examined, we discover no prohibition of these agreements in England or in the United States, but express permission and authority granted to married women by the statutes and decisions of Colorado to make any contracts they choose with their husbands, or with any other

persons they may select. When the decisions of the courts are read, the uniformity of their conclusions is notable. The question has indeed been a fruitful source of debate among lawyers, and its discussion has afforded frequent and perhaps welcome opportunities for judges to express their abhorrence of the acts which led to such agreements, and to deprecate their existence; but there never seems to have been any real doubt, either in England or in the United States, that they were in accord with a sound public policy, and were enforceable in courts of equity. There is an unbroken series of decisions in England, from Seeling v. Crawley, which was decided by the master of the rolls in the year 1700 (2 Vern. 385), to Wilson v. Wilson, in which the opinion was rendered by the lord chancellor in the house of lords in 1848 (1 H. L. Cas. 538, 573), that agreements of this character are valid, and that they are not in contravention of sound principles of public policy. Angier v. Angier, 2 Prec. Ch. 496; Bateman v. Countess of Ross, 1 Dow, 235; Elworthy v. Bird, 2 Sim. & S. 372; Logan v. Birkett, 1 Mylne & K. 220; Frampton v. Frampton, 4 Beav. 287; Jones v. Waite, 9 Clark & F. 101; Wilson v. Mushett, 3 Barn. & Adol. 743; Wellesley v. Wellesley, 10 Sim. 256. Repeated decisions of the courts of this country announced the same conclusions, and enforced the performance of these contracts, until in 1869, in Walker v. Walker's Ex'r, 9 Wall. 743, 750, Mr. Justice Davis, in delivering the opinion of the supreme court, declined to discuss the question, and declared that:

"Contracts of this nature, for the separate maintenance of the wife through the intervention of a trustee, have received the sanction of the courts in England and in this country for so long a period of time that the law on the subject must be considered as settled." Carson v. Murray, 3 Paige, 483, 501; Wells v. Stout, 9 Cal. 480, 493; Walker v. Beal, 3 Cliff. 155, 166, Fed. Cas. No. 17,065; Hutton v. Hutton's Adm'r, 3 Pa. St. 100; Dillinger's Appeal, 35 Pa. St. 357, 362; Hitner's Appeal, 54 Pa. St. 110, 115; Com. v. Richards, 131 Pa. St. 209, 218, 18 Atl. 1007; In re Scott's Estate, 147 Pa. St. 102, 110, 23 Atl. 214; Thomas v. Brown, 10 Ohio St. 247, 250; Beitle v. Wilson, 14 Ohio St. 257, 269; Garver v. Miller, 16 Ohio St. 528, 531; Doyle v. Doyle, 50 Ohio St. 330, 34 N. E. 166; Dutton v. Dutton, 30 Ind. 452; Loud v. Loud, 4 Bush, 453, 461; Robertson v. Robertson, 25 Iowa, 350; Going v. Orns, 8 Kan. 87.

In view of the public policy of the nation upon this subject, evidenced by these decisions, and of the policy of the state of Colorado, declared by the acts of its legislature and the decisions of its courts to which we have adverted, there is no escape from the conclusion that an agreement of separation between a husband and wife, whereby he provides for her separate maintenance, and she covenants to release all her claims upon his estate, is lawful, and presumptively valid, without plea or proof of its equity, reasonableness, or fairness to the wife. The plea of the naked agreement as a bar to this suit was therefore good, without any averment of the facts and circumstances which made it just and equitable to the appellant when it was executed.

Moreover, the appellant conceded this to be the law by the course of her pleading. She did not allege that there was any fraud in the procuring, or any unreasonableness in the terms of, the agreement of separation, in her bill. Nor did she pray for its cancellation and

avoidance. She did not mention it. The bill was filed on April 2, 1891. The plea of the contract of separation as a bar to the suit was interposed on July 29, 1892. The office of a plea is to present some distinct fact which of itself is a bar to the suit, and avoids the necessity of going into the evidence at large. When a plea is interposed, the complainant has the option to set it down for argument, and thereby to challenge its legal sufficiency, or to deny the truth of the averments it contains, and to go to a hearing on the questions of fact. If he adopts the former course, he thereby admits the truth of the facts stated in the plea, but denies their sufficiency in law to prevent his recovery. If he takes the latter course, he admits that, if the facts stated in the plea existed, they were legally sufficient to defeat his suit, but denies their existence. The appellant took the latter course. She did not set the plea down for argument, but she filed a general replication to it, and went to a final hearing upon the issue thus presented. She thereby admitted that the plea was sufficient in law, and the only question she raised was whether or not the allegations of the plea were true in fact; and if, upon the final hearing, they proved to be true, the appellees were entitled to a dismissal of the bill. U. S. v. California & O. Land Co., 148 U. S. 31, 39, 13 Sup. Ct. 458; Farley v. Kittson, 120 U. S. 303, 314, 315, 316, 7 Sup. Ct. 534; Hughes v. Blake, 6 Wheat. 453, 472; Rhode Island v. Massachusetts, 14 Pet. 210, 215.

The suggestion in the brief of the appellant and in the assignment of errors that the court below improperly overruled an exception to this plea as impertinent, and erroneously refused to permit the appellant to file an amended bill, has not escaped our attention. There was certainly nothing impertinent in the plea, and, as counsel for the appellant has not deemed the ruling upon the proposed amendment to the bill of sufficient importance to point out the pages of the record on which the amended bill and the order concerning it may be found, we assume, in accordance with our usual practice, that the question they suggest here is not of such gravity as to warrant a search for it through the 1,398 pages of the printed transcript of the record in this case.

We come, therefore, to the consideration of the merits of the case,—to the consideration of a contract of a character in accord with the public policy of the state and the nation, and clothed with the presumptions of validity and fairness, under the evidence presented at the final hearing. Counsel for the appellant zealously and persuasively argue that the facts established by this evidence show that this agreement was void because it contained on its face stipulations in contravention of public policy, because it was procured by the fraud and misrepresentations of the husband, and because it was inequitable and unfair to the appellant. It will be conducive to clearness and brevity in the discussion of the reasons which they urge in support of this argument to briefly state here the material facts which the evidence discloses. They are these: In July, 1882, William B. Daniels was a prosperous merchant, about 50 years of age, residing in the city of Denver, and was the owner of property of the value of about $700,000, while the appellant was

a woman about 30 years of age. On July 8, 1882, Daniels and the appellant were married. Early in December, 1882, Daniels consulted Ebenezer T. Wells, a practicing lawyer of the city of Denver, who had been a judge of the supreme court of the territory and state of Colorado, and requested him to meet himself and wife at their residence in that city. Mr. Wells did so, and, after some conversation with them, he told Daniels that the differences between himself and his wife were so radical that he could not act for both; that he would act for and advise him, if he desired, or, if he would release him from his retainer, he would advise and act for the appellant. Thereupon Daniels released him from his retainer, and he proceeded to advise the appellant and to conduct her negotiations with her husband. Daniels wished a separation. The appellant wanted money or property. Daniels offered her $50,000. Mr. Wells demanded $100,000. Negotiations continued for five or six weeks, and they finally agreed that Daniels should pay his wife $75,000. Thereupon Mr. Wells prepared the agreement of separation, either read it to the appellant, or caused her to read it, and explained it to her until she fully understood all its provisions, and then it was executed. It was signed and delivered on January 15, 1883. During the negotiations preceding the contract, and for a few weeks afterwards, Daniels wrote affectionate letters to his wife, in which he expressed the hope, intention, and belief that in a few weeks after the agreement of separation was signed they would live together again as man and wife; and during a few weeks after the execution of the contract they occasionally visited and cohabited with each other, but with these exceptions they separated in December, 1882, and always thereafter lived apart. The stipulations of the agreement were these: Daniels agreed to convey and deliver to the appellant $15,000 in cash, and specified real property of the value of $60,000, making $75,000 in all, to pay her counsel fees to Mr. Wells, to release her from her obligation to live with him as his wife, and covenanted that all the property of which she should die seised should descend and be distributed to her other heirs at law as if he and the appellant had never been married. The appellant covenanted and agreed that she would support and maintain herself so long as she lived separate from her husband; that she would never ask, demand, or claim any part or portion of, or any interest in, the estate of which Daniels should die possessed; and that the same should descend and be distributed to his other heirs as if she and Daniels had never been man and wife. They mutually covenanted that unless otherwise agreed in writing they would live separate; that if at any subsequent time they should, by agreement in writing, come together and live as husband and wife, the appellant should be entitled to maintenance and support from her husband while they should so continue to live together, but that such coming together and living as man and wife should not abrogate, alter, or change in any other respect the agreement of the parties as to their rights to their respective property; and that, if Daniels should call upon or visit the appellant, that should not be deemed a resumption of the marriage relation, or entitle the

appellant to anything by way of maintenance or support. Daniels immediately performed his part of the agreement. He paid the appellant $15,000, paid her counsel fees, and conveyed to her the property specified in the contract, and she accepted and retained the money and the land. Daniels died on December 24, 1890, and this suit was commenced on April 2, 1891, to recover one-half of the property of which he died seised. It is upon this state of facts that the counsel for the appellant contend that she is entitled to ignore the contract and its performance, and to recover a share of the estate of her former husband. It is well to bear in mind, in considering this proposition, not only the facts we have recited, but the nature of this suit, and the relation which the parties sustain to it. It is a suit in equity. But it is not a suit by the appellees to enforce specific performance of the agreement of separation. That contract has been completely performed, and they seek no relief at the hands of this court. The appellant alone asks relief, and she prays a court of equity to disregard her agreement, her covenant never to claim any interest in the property here in question, and her acceptance and retention of the $75,000 which she received therefor, and to grant her the same share in the estate which her former husband left which she would have received if she had never covenanted to renounce it. We are now prepared to give attention to the several considerations which her counsel urge in support of their position that this relief should be granted.

They say that the contract is void, and constitutes no defense to this suit, because it was not made through the intervention of a trustee. But the only reason why a trustee was ever essential to such agreements was that under the common law the wife was disabled from contracting directly with her husband, and from bringing suits in her own name. Nevertheless, even under the common law, an agreement of separation without the intervention of a trustee was valid and enforceable in equity; and under the statutes of Colorado, which empower the wife to make any contract with any person, since the reason of the rule has entirely ceased, the rule no longer prevails. Under the statutes of Colorado a contract of separation between husband and wife without the intervention of a trustee is valid both at law and in equity, and under the common law such an agreement is enforceable in equity. Mills' Ann. St. Colo. § 3021; Wells v. Caywood, 3 Colo. 487, 496; Scott v. Mills, 7 Colo. App. 155, 157, 42 Pac. 1021; Jones v. Clifton, 101 U. S. 225, 229; Hutton v. Hutton's Adm'r, 3 Pa. St. 100, 104; Com. v. Richards, 131 Pa. St. 209, 218, 18 Atl. 1007; In re Scott's Estate, 147 Pa. St. 102, 110, 23 Atl. 214; Dutton v. Dutton, 30 Ind. 452, 455; Robertson v. Robertson, 25 Iowa, 350, 354; Going v. Orns, 8 Kan. 85.

It is contended that the contract was abrogated because there was subsequent cohabitation between the parties to it for a few weeks after its execution. But it is not subsequent cohabitation alone which avoids such agreements, but the intentional renunciation of them, and the reconciliation which the resumption of marital relations sometimes evidences. So far as subsequent cohabitation establishes such an intention, and so far only, does it have

the effect of avoiding the contract. It had no such effect in the case at bar, because it evidenced no such intention. The agreement expressly provides that, if Daniels should call upon or visit the appellant, this should not be deemed a resumption of the marriage relation, and should not entitle the appellant to anything by way of maintenance and support, and that, if the parties to it should subsequently come together and live as husband and wife, such coming and living together should entitle the appellant to maintenance and support while she so lived, only, but should in no way abrogate or modify the agreement so far as it related to other rights of property. These stipulations make perfectly clear the intention of these parties to secure and to preserve their rights and the rights of their heirs in their respective estates as they were fixed by the contract, regardless of the question whether or not there should be subsequent cohabitation. It is said, however, that this agreement was immoral and against public policy. The position is untenable. It is not contra bonos mores for a husband and wife to live together, and when, for any reason, unfortunate differences have separated them, it is not in violation of sound principles of public policy for them to make an agreement whose only tendency is to prevent a prolonged estrangement, and to induce a reconciliation and a resumption of the marital relations. In Walker v. Walker's Ex'r, 9 Wall. 743, 745, 752, an agreement of separation was made, whereby the husband settled upon the wife, in full, in lieu of dower, the sum of $50,000; and the parties agreed that, if they should come together again, the trust should remain and be executed in like manner as if they should live separate. They subsequently came together and lived as man and wife until June, 1860,—more than 14 years. When the claim was made that this subsequent cohabitation avoided the contract, and that the agreement that they might live together without affecting the rights secured under it was in contravention of a sound public policy, the supreme court said:

"It is insisted the obligation of the trust was discharged when the wife returned to her husband's house, but this is a mistaken view of the effect of the instrument. It was the intention of the parties that the arrangement should be permanent, and, to accomplish that purpose, the agreement was framed so that the wife should enjoy her separate estate during life, although she should subsequently become reconciled to her husband and cohabit with him. We can see no valid objection to such a provision, and it is certainly supported by authority [citing Wilson v. Mushett, 3 Barn. & Adol. 743; Bell, Husb. & Wife, 525–541]. The husband had a right to make a settlement upon his wife without any view to separation, and the insertion of this provision shows that he did not intend the settlement to cease on the return of the wife to cohabitation. There is no good reason why effect should not be given to the intention of the parties on the subject. If, on grounds of public policy, it is desirable that the parties should be reconciled, whatever tends to promote such a result will receive the favorable consideration of a court of equity."

In Randle v. Gould, 92 E. C. L. 456, a stipulation in an agreement of separation that the contract should not be invalidated unless the parties should subsequently make and perform a written agreement to live together as man and wife for a month was sustained. To the same effect are Hitner's Appeal, 54 Pa. St. 110, 116;

Walker v. Beal, 3 Cliff. 155, 166, Fed. Cas. No. 17,065; and Wells v. Stout, 9 Cal. 480, 499. But the decision in Walker v. Walker's Ex'r is conclusive here, and pretermits further discussion. Neither the subsequent cohabitation, nor the stipulations of the parties that their subsequent living together should not avoid or modify their contract as to their rights of property, abrogated the agreement of separation.

Another position taken on behalf of the appellant is that the con-tract is void because it contravenes the public policy of the state of Colorado, evidenced by sections 3010, 3011, Mills' Ann. St. Those sections provide that a married woman may not bequeath away from her husband more than one-half of her property without his consent in writing, and that the husband may not by will deprive his wife of over half of his property unless she accepts the condition of the will after his death. But since these restrictions are expressly limited to dispositions by will, and as the husband is left entirely free while he lives to sell and convey all his property, real and personal, without the joinder or consent of his wife (Hanna v. Palmer, 6 Colo. 160), and since the wife is expressly empowered to make any contract she chooses while she is living, we fail to perceive any indication in these provisions of a public policy adverse to this contract, by which living parties disposed of property, and fixed their rights to it, not by will, but by convention.

It is strenuously argued that the agreement is nugatory because it is a release or acquittance of a mere expectancy,—of the mere possible interest which the wife might have as a distributee of her husband's estate. It is true that a mere possibility, such as the expectancy of an heir, is not transferred or conveyed by a mere release or quitclaim, because such a release conveys interests in existence only, and a presumptive heir has no vested or existing interest in the property of his ancestor before his decease. Bayler v. Com., 40 Pa. St. 42; Dart v. Dart, 7 Conn. 254. It is equally well settled, however, that a contract or covenant with the ancestor, made for a valuable consideration, by a presumptive heir or distributee, to the effect that he will not claim or receive any share or interest in the property of which the ancestor may die seised, and that the latter's estate shall descend and be distributed to his other heirs, inures to the benefit of the latter, and constitutes a complete estoppel against any claim of the covenantor to the property at law, and a valid agreement to renounce it, enforceable in equity. The appellant made such a covenant, and is thereby estopped from asserting any claim to any share in the property left by her former husband. Thus, in Hobson v. Trevor, 2 P. Wms. 191, Lord Chancellor Macclesfield compelled the performance of an agreement in marriage articles to convey to a husband a third part of what should come to the father of the wife on the death of his father; and in Beckley v. Newland, Id. 182, the same chancellor enforced a contract between the husbands of two presumptive heirs to divide equally what should be left to them. In re Garcelon's Estate, 104 Cal. 570, 585, 38 Pac. 414; Havens v. Thompson, 26 N. J. Eq. 383, 386; Brands v. De Witt, 44 N. J. Eq. 545, 548, 10 Atl. 181, and 14 Atl. 894; Kershaw v. Ker-

shaw, 102 Ill. 307, 312; Quarles v. Quarles, 4 Mass. 680; Kenney v. Tucker, 8 Mass. 143; Nesmith v. Dinsmore, 17 N. H. 515. The contract of a husband not to claim his expectant interest in his wife's estate is effectual (Crum v. Sawyer, 132 Ill. 443, 461, 24 N. E. 956); and the covenant of a wife, in articles of separation, that she will not take or claim her expectant interest in her husband's property, is equally conclusive upon her, and inures to the benefit of his heirs and devisees. Thus, in Garver v. Miller, 16 Ohio St. 527, the widow was entitled to a distributive share of one-half of the first $400 and one-third of the residue of her husband's estate at his death, under the statutes of Ohio. But it was held that a reasonable parol postnuptial contract, made for a valuable consideration, and executed on the part of the husband, whereby the wife had agreed with him to release and relinquish all her claims as a distributee of his estate, constituted a legal and effective contract. To the same effect are Wilson v. Wilson, 1 H. L. Cas. 538; Thomas v. Brown, 10 Ohio St. 247, 250; Hutton v. Hutton's Adm'r, 3 Pa. St. 100, 104; Hitner's Appeal, 54 Pa. St. 110, 115; Dillinger's Appeal, 35 Pa. St. 357, 362.

The suggestion is thrown out that the contract was void because the evidence does not disclose any good cause for the separation, and because it does not show that the appellant knew the value of her husband's property when she made the agreement. The record contains no evidence upon these subjects, and these objections are therefore laid at rest by the conclusion reached in the earlier part of this opinion, that the presumption is that the contract is valid and not void. In accordance with this conclusion the legal presumption is, and it must prevail in the absence of countervailing proof, that the cause for the contract and for the separation was a good one, and that the appellant's knowledge of all the material facts which conditioned the negotiations and the agreement was ample. Besides, since the parties had the legal right to enter into this agreement, their cause or reason for so doing was for their own consideration and decision exclusively; and, as they deemed it sufficient, the question of its character or sufficiency is not open for the consideration of the courts, and the contract would stand even if in their opinion the cause for it was inadequate, or there was no cause for it.

A forcible and persuasive argument for the disregard of this agreement has been presented on the ground that it was procured by the fraud and misrepresentation of Daniels, and that it was unjust and unfair to the appellant. The facts upon which reliance was placed to establish the fraud are that Daniels repeatedly wrote to his wife, while the negotiations for the contract were in progress, that in a short time after it was signed they would again come together, and live as husband and wife; that the agreement shows on its face that it was made in contemplation of the fulfillment of this promise; that he brought his own lawyer to the conference with his wife in December; that, when the lawyer announced that the differences between them were so wide that he could not act for the wife while he was retained by the husband, the latter released him; that Mr. Wells thereupon acted for the appellant; and

that Daniels afterwards paid his fee. The facts relied upon to establish the proposition that the contract was unjust and unfair to the appellant are that the property of Daniels was worth $700,-000, and the amount accepted by the appellant in lieu of mainte-nance and of her share in his estate was $75,000. There was noth-ing in the letters of Daniels or in the provisions of the contract relative to a future reconciliation of which fraud can be predicated. A willful intent to deceive, or such gross negligence as is tanta-mount thereto, and the actual deceit of the victim, to his damage, are essential elements of actionable fraud. The perpetrator must have been guilty of some moral turpitude or of some breach of duty, and the victim must have been deceived, and must have acted upon the deceit. Bank v. Farwell, 19 U. S. App. 256, 262, 265, 7 C. C. A. 391, 394, 396, and 58 Fed. 633, 636, 639; Insurance Co. v. Mc-Master's Adm'r, 57 U. S. App. 638, 644, 30 C. C. A. 532, 535, and 87 Fed. 63, 66; Henshaw v. Bissell, 18 Wall. 255, 271. The acts and letters of Daniels fail to indicate that he did not honestly intend to carry out the promises which he made, and to bring to fruition the hopes which he expressed in his letters. They impress us as the letters of an honest but anxious and disappointed husband, hoping and seeking for the reconciliation which he pictured. Moreover, neither the letters nor the contract contain any misrepresentation or misstatement of any fact which conditioned the bargain. The statements relied upon to establish the fraud all relate to the fu-ture. Under a fair construction, they are hardly more than ex-pressions of a hope or an intention to live with his wife at some indefinite time in the future; and, at most, they were either prom-ises or prophecies, and fraud may not be predicated of either. Railway Co. v. Barnes, 27 U. S. App. 421, 12 C. C. A. 48, and 64 Fed. 80; Sawyer v. Prickett, 19 Wall. 146, 163; Kerr, Fraud & M. (Bump's Am. Notes) 85, note 3; Insurance Co. v. McMaster's Adm'r, 57 U. S. App. 638, 644, 30 C. C. A. 532, 535, and 87 Fed. 63, 67. A careful reading of all the evidence relative to the connection with this case of Mr. Wells, who prepared the agreement of separation, and conducted the negotiations which led to it, on behalf of the appellant, has left our minds free from all doubt relative to this charge of fraud. His conduct throughout was in strict accord with the high ethical standards of that profession whose members have been advisedly selected by the common knowledge and experience of mankind as the safest trustees of their most important and sa-cred public and private interests. When he learned that radical differences existed between this husband and wife, he at once re-fused to act for or advise the latter while he remained under the retainer of the former. When the husband had released him from the obligations of his retainer, and he had consented to act for the wife, he demanded $100,000 for her separate maintenance and her covenant to renounce her share of her husband's estate, and he finally secured $75,000 for her, although before his retainer she had offered to accept $50,000. He drew a contract in strict accord with the decisions of the courts and the public policy of the nation, which clearly expressed the intention of the parties and firmly

fixed their rights. He read it to his client, or caused her to read it, and explained it to her until he was sure that she thoroughly understood it. It is true that he finally received his fee for this work from the husband, but it was no secret fee paid for services in behalf of the latter. It was a reward which he had honorably earned by efficient service for the appellant, and which her husband paid by express agreement between himself and his wife, and Mr. Wells took good care that this fact and this stipulation should plainly appear on the face of the contract. That he was the lawyer of the husband before he became the counsel for the wife is but another assurance that her interests were well and wisely guarded. It shows that Daniels had been inspired with a confidence in his character and ability which the appellant found, the event proved, and the record shows was well founded. Mr. Wells conducted the negotiations of the appellant for this contract for five or six weeks before it was signed. His knowledge was the knowledge of his client, and no surer guaranty could be afforded to a court that an agreement was advisedly made with full knowledge of the financial standing and relations of the parties, and without fraud or undue influence, than the fact that it was prepared and advised by a lawyer of the character, caution, and ability which this record shows that Mr. Wells possessed. There was no fraud in the procuring or making of this contract. Nor are we persuaded that it was inequitable, unjust, or unfair to the appellant. In Walker v. Walker's Ex'r, 9 Wall. 743, 745, the wife had lived with her husband for years, and had borne him two children. He had received about $50,000 from her father's estate, and his property was worth between $300,000 and $400,000. But $50,000 was considered a suitable amount to settle upon his wife for her separate maintenance, and in lieu of dower. In the case at bar the property of the husband was worth $700,000. But the appellant had brought none of it with her. She had not assisted to earn or to save it. She had borne her husband no children, and she had lived with him less than seven months. He had a son by a former wife, and she was childless. She received $75,000,—more than $10,000 per month for the brief period she lived with her husband, and an amount sufficient, with reasonable care and economy, to support her in comfort until she died. Her counsel at that time undoubtedly thought that he had procured a fair, just, and reasonable consideration for her covenant to release her share in the estate of her husband and to maintain herself, and we heartily concur in that opinion.

The various objections of the appellant to the defense based upon the agreement of separation have now been considered, and the result is that the contract was valid in its inception, and that its execution by Daniels constitutes a complete bar to the relief sought by the appellant in this suit. As we review the entire record, and part with this case, the righteousness of this result is clear. The appellant made her covenant that she never would claim anything from the estate of her husband, and that she would support herself; and for it she secured $75,000, and freedom from her obliga-

tions to live with her husband. Daniels paid her this consideration, and she accepted it, in 1883. She now asks that the performance and the contract be undone, and that she recover as if they had not been. She has enjoyed her freedom from marital duties during the life of her husband, and she has received the $75,000, and she is now praying a court of equity to grant to her the share of her husband's estate which she agreed to surrender for these considerations. She seeks to renounce the burdens of a valid contract, whose benefits she received. There is no equity in such a case. Courts of equity sometimes enforce the specific performance of a contract, but they never undo the accepted execution of a lawful agreement. U. S. v. Northern Pac. R. Co. (C. C. A.) 95 Fed. 864, 880; Illinois Trust & Savings Bank v. City of Arkansas City, 40 U. S. App. 257, 294, 22 C. C. A. 171, 193, and 76 Fed. 271, 293; U. S. v. Winona & St. P. R. Co., 32 U. S. App. 272, 291, 15 C. C. A. 96, 108, and 67 Fed. 948, 960.

The conclusion at which we have arrived upon a consideration of the agreement of separation renders it unnecessary for us to discuss the defenses founded on the statute of limitations and the decree of divorce.

At the December, 1898, term of this court, an order was made that the appellant should print such additional portions of the record in this case as the appellees should designate, and that, if the court should determine that the portions so designated by the appellees were not necessary for the consideration of the errors assigned, the cost of such printing should be taxed against the appellees. Under that order the appellees designated certain portions of the record for printing, and among others the entire certified record in the divorce proceedings of Minnie E. Warren v. Lyman E. Warren, which was introduced in evidence by the appellees. This portion of the record was not necessary for the consideration of the errors assigned by the appellant, and the cost of its printing must be paid by the appellees. The decree below is affirmed, with costs, but the appellant may recover of the appellees the cost of printing the certified copy of the record in Warren v. Warren, and the clerk will tax the same accordingly.