## No. 9090.

### HUGHES v. LEONARD ET AL.

1. HUSBAND AND WIFE—*Separation Agreement.* A separation which has actually occured, no prospect of reconciliation appearing, is of the same effect as the basis of a separation agreement as if upon mutual agreement in the beginning.

A contract entered into in such case, no unfair advantage being taken of the wife, is a bar to her subsequent action assailing a disposition of the husband's estate, by him, in view of his approaching demise.

Agreement of separation by which the wife accepts the provision made for her from the husband's estate. Action by the wife to vacate the husband's subsequent disposition of his property. Evidence of the wife's physical and mental incompetency, unsatisfactory in itself, is overcome by the fact that in all stages of the negotiation which resulted in the agreement, she was represented by counsel.

2. *Right of Wife in the Estate of Her Husband.* Subject to the prohibitions prescribed in *Smith & Smith v. Smith,* 22 Colo. 480, the husband is entitled to dispose of his property, at his pleasure, and his threats made to the wife to do so, are not coercion.

3. CONTRACT—*Ratification—Laches.* Acts of dominion over property received under a contract, after knowledge of existing grounds of rescission amount to ratification.

4. EQUITY—*Laches,* need not be pleaded.

5. FRAUD—*Pleading.* Where years after the execution of a contract rescission is demanded upon the ground of fraud, the plaintiff must expressly allege that he believed the false representations upon which he relied, and the time of discovering the falsities.

*Error to Denver District Court, Hon. John A. Perry, Judge.*

*En banc.*

Mr. JOHN T. BOTTOM, Mr. THOMAS J. DIXON and Mr. N. WALTER DIXON, for plaintiff in error.

Messrs. HUGHES & DORSEY, Mr. E. I. THAYER and Mr. BERRIEN HUGHES, for defendants in error.

APRIL 29, 1915, John J. Hughes (since deceased) and plaintiff, Emily Hughes, were husband and wife. On that date, said John J. Hughes conveyed lots 29 and 30, in block 111, East Denver Subdivision of the Congressional Grant of the City of Denver, and lots 15 and 16, in block 122, Stiles' Addition to the City of Denver, to the defendant, Thomas W. Leonard, the consideration named in the deed being one dollar and other good and valuable considerations.

May 3, 1915, said deed was filed for record, and recorded in book 2558, page 323, of the records in the office of the Clerk and Recorder of the City and County of Denver.

May 4, 1915, said John J. Hughes died, leaving as his sole heir at law his widow, this plaintiff, Emily Hughes.

May 5, 1915, defendant Leonard quit-claimed said property to the defendant Jane F. Dunn, by deed filed for record May 12, 1915, and recorded in book 2460, at page 45, of said records, the consideration named in said deed being one dollar.

Plaintiff brings this action to have both deeds set aside on the ground that the warranty deed is a testamentary disposition made by decedent to circumvent the law, and in fraud of the rights of the widow; that the quit-claim deed was executed in furtherance of the same plan, and that both deeds were without consideration.

The complaint alleges that at the time of the execution of the warranty deed, John J. Hughes was ill, and believed himself near death; that he placed this deed in the hands of Leonard, with instructions to hold until the issue of said illness should become certain; that should said illness prove fatal, Leonard was instructed to immediately place the instrument of record, and convey the property to Dunn; otherwise to destroy the warranty deed or return it to said John J. Hughes; that when Leonard placed said warranty deed of record he was certain John J. Hughes "was about to die"; that the quit-claim deed from Leonard to Dunn was, in fact, not delivered, but was filed of record by Leonard himself; that Jane F. Dunn is a niece of decedent,

and resides in Boston, Massachusetts; that the warranty deed was received by Leonard with full knowledge of the fraudulent purpose of decedent.

The quit-claim deed contains the following recital: "This deed is made to vest title to said property in the said party of the second part in pursuance of instructions from John J. Hughes, from whom the said party of the first part received his title to the same." Both defendants filed demurrers to the amended complaint. Both demurrers were overruled.

Defendant Dunn denied, by answer, that when decedent executed the warranty deed he believed he was in danger of death; denied the alleged instruction of decedent to Leonard; denied that Leonard believed John J. Hughes was about to die at the time of the filing of the warranty deed for record; denied that the deeds were without consideration, or were executed to circumvent the law, or in fraud of the rights of the plaintiff. For a second defense, she set up a contract of separation between Hughes and his wife, of date July 29, 1907. This contract recites, among other things, that by reason of "unhappy differences" the husband had left his wife in October, 1906, since which time they had lived apart, and that the husband refuses to return to his wife and home; that "for the purpose of making and having a complete settlement of all the property rights and financial obligations between them," the home and its furnishings should be deeded to the wife, $400 in cash paid to her, and, in addition thereto, $50 per month for ten months; "the party of the second part agrees and is hereby obligated to support and maintain herself, and not hereafter at any time nor in any manner call upon party of the first part, his heirs or lawful representatives, for any contribution of money or property whatsoever for her future needs, nor ask for, seek or demand in any manner whatsoever any part of the property or fruits of the labor of the party of the first part, either alimony or otherwise; and it is agreed that in the event of the death of either of the parties hereto the

other party shall not ask for, seek, demand or receive, or have any claim upon or interest in any part of the estate of the other party, by virtue of the marriage relation existing between them, either as widower or widow or heir, under any provision of law, statutory or otherwise, now in force or which may hereafter be enacted, so long as said parties shall continue to live separate and apart."

Defendant further alleges that this contract was filed for record September 19, 1907; that decedent complied with its terms, and that, by reason thereof, plaintiff has waived any rights she might otherwise have in this property in question and is estopped from making any claim thereto.

Defendant Leonard answered, disclaiming any interest.

Plaintiff, by replication, admitted the making of the contract. She further alleged that when she was in ill health her husband had deserted her, and left her penniless; had attempted to coerce her into an action for divorce, and, while she was suffering physically and mentally, she acquiesced, through her attorney, in a plan of separation; that a contract was drawn by her counsel, but that the contract, as signed, was dictated by her husband, who represented to her that he was a poor man, that there was a judgment of $12,000 against him, which stood as a lien against all his property, that he would give plaintiff no more money, and that she could take what the contract gave her or nothing; that she believed her husband would fight her to the end, would cause litigation to be prolonged, and eventually leave her destitute; that she did not sign the agreement of her own free will; that its conditions are unjust; that there is a lack of sufficient consideration; that there was, in fact, no judgment against her husband; that he was worth approximately $100,000; that the residence conveyed to her under the contract was not then worth over $6,000, and is not now worth over $4,000, and the furniture, etc., $300; that the $400 paid her in cash was for the payment of bills for her support, and that all these things were known to the husband at the time of the signing of the contract.

Other pleadings were filed, and rulings thereon made by the trial court, not now necessary to notice.

Trial was to the court without a jury. Plaintiff moved for default against the defendant Leonard, which motion was denied. At the close of plaintiff's case, defendant moved for a non-suit, which motion was granted. September 14, 1913, motion for new trial was overruled, and final judgment was rendered in favor of the defendants, dismissing the amended complaint and for costs, and from said judgment this writ of error is prosecuted.

Plaintiff was called as a witness in her own behalf. Objection was made to her being sworn or testifying on the ground that she was an incompetent witness under the statute. This objection the trial court sustained, on the ground of the decision of this court in *Conner v. Root,* 11 Colo. 183, 17 Pac. 773. Thereupon, her counsel made an offer to prove by her substantially the matters set out in her pleadings. A portion of that offer is as follows:

"That she consulted an attorney, Mr. Keeler, as to what she should do, and he advised her to go ahead and buy what she wanted for her support, and that her husband would pay for it; * * * that she again consulted Mr. Keeler, and he advised her to wait a year and sue for divorce; that when she stated to him that she did not want a divorce, he advised her, or suggested to her, that her husband go to Nevada and get a divorce from her. That thereupon she lost confidence in said attorney and turned to Mr. Bottom. * * * That her attorney, Mr. Bottom, called upon her husband, and advised her that her husband had stated, 'What I want is separation papers, if she won't get a divorce, and I won't give her any money for her support until then.' * * * That during all of said time (from the summer of 1907 until the time of the beginning of this action, in October, 1915) she was afraid to bring any action in court against her husband, because she knew his character and disposition thoroughly, and she verily believed that if she did, he would make away with his property or

wear her out with litigation, so that she would obtain no relief.  *  *  *  That she has never considered said agreement to be binding upon her, and that she did not attack it during the lifetime of her said husband because she feared and verily believed that if she should cause said agreement to be set aside, that what of her husband's property was not spent in litigation would be so disposed of by him that she would not be benefited by such proceeding. That she had no accurate knowledge of her husband's means, but understood that he was very well off; that she knew that he owned considerable real estate, but did not know whether the same was encumbered, and that he owned considerable mining stock. That he was then engaged in dealing in mining stocks, and that she frequently, before the separation, saw letters to him enclosing checks for dividends upon such stocks."

Mr. Bottom, a witness for plaintiff, and her counsel in the negotiations with her husband, testified that he prepared an agreement, which did not suit Mr. Hughes, who later came to Mr. Bottom's office with the one set out in the pleadings. "Mr. Hughes told Mrs. Hughes that she would have to sign this agreement or he would not give her a cent." That in one interview which witness had with Hughes in the Brown Palace Hotel, Hughes stated that the only property he owned was two or three pieces of real estate, one of which was the home; that he was in debt for a larger amount than the value of all of it; that he had a judgment against him which would wipe out all of the real estate; that he refused to give the wife anything except the home; that witness reported this conversation to Mrs. Hughes, and the result thereof was that Hughes brought in the contract in question.

Sara Huddart, a witness for the plaintiff, testified that she had a conversation with Hughes in August, 1910 (almost five years before the death of Hughes, and more than five years before the filing of this suit), in which Hughes said, "I was too cute for her. I was getting ready to leave

her five or six years ago, and I covered my property so she would not ever get anything, and she would not have gotten the house if she had not homesteaded it." This testimony was stricken out on motion of the defendant.

Mr. Justice Burke delivered the opinion of the court:

The first question for consideration is the validity of this contract of separation. There is nothing in it which, under the laws of Colorado, is against public policy.

Attorneys for plaintiff in error urge that inasmuch as this contract fails to set forth a good cause for the separation, the contract is invalid. They admit that if a separation is "inevitable," whether a property settlement is made or not, then a separation agreement settling the property rights of the parties may be made without violating public policy; but they further contend that such separation must, in the first instance, be by agreement of the parties. In this we think they are in error. If it appears, as here, that such separation had first been definitely determined upon by one of the parties, that it had in fact thereafter taken place, and that no prospect of a reconciliation appeared, then such separation would be just as "inevitable" and furnish as good a basis for a separation agreement as if it had originally taken place by mutual consent. Mrs. Hughes could not compel her husband to live with her or remain in his home. If she were not at fault, she could compel him to support her in such circumstances as his means justified. If she were without personal knowledge of such means, our statutes afforded her an ample remedy to compel her husband to disclose them. Under these conditions, the cause of the separation and the reasons for the execution of the contract were exclusively for the determination of the parties. By their contract they found them sufficient, and if the wife were not coerced into its execution, if no unfair advantage were taken of her by her husband, that contract is her own determination of the fact that a separation was "inevitable," and is a complete bar to her action. We think every question necessary to this conclusion has been settled,

and correctly settled, by the opinion of Judge Sanborn in *Daniels v. Benedict*, 97 Fed. 367, 38 C. C. A. 592.

If the plaintiff were coerced into making this contract, or if any unfair advantage was taken of her by her husband, those allegations must depend for their proof upon the testimony hereinbefore set out. If the ruling of the trial court excluding the testimony of the plaintiff was erroneous (a question which it is unnecessary to determine herein), was the plaintiff prejudiced thereby?

It is not presumed that counsel for plaintiff, in his offer of proof, set forth in detail what her testimony would be, but it is presumed that, having made the offer, he set it forth in substance; that, if her testimony would be material to any issue in the case, his offer would disclose that materiality. On the contrary, the offer convinces us of the immateriality of the excluded testimony. Plaintiff contends that she was coerced into the making of this contract, first by her husband's threats to alienate his property in case of her refusal; second, that she was misled by his statement that he was a poor man, and that there was a judgment against him of $12,000, which was a lien against his property. Under our law, the husband had a perfect right to alienate this property during his lifetime, subject to the prohibition of the rule laid down in *Smith v. Smith*, 22 Colo. 480, 46 Pac. 128, 34 L. R. A. 49, 55 Am. St. 142, and his threat to do what it was his lawful right to do can not be held to be coercion. That plaintiff was not misled by her husband's allegations of poverty is clearly shown by her counsel's offer of her testimony, "that she had no accurate knowledge of her husband's means, *but understood that he was very well off*." She further contends that at the time of the making of this contract she was ill and incompetent, physically and mentally, to execute such an agreement. The evidence of such incompetence is of itself very unsatisfactory, and is more than overcome by the fact that she was at all stages of her negotiations represented by counsel. She further attempts to show that the same

influence by which she was induced to enter into this contract kept her silent and inactive from the date of its execution to the day of her husband's death.  This contention is set forth in her pleadings, but more particularly in the offer of her counsel, "that during all of said time she was afraid to bring any action in court against her husband because she knew his character and disposition thoroughly, and she verily believed that if she did he would make away with his property or wear her out in litigation so that she would obtain no relief."  It can not be presumed that the courts would permit him to make any defense which, under the law, he was not entitled to make, or unreasonably prolong the litigation, or fail to make proper provision for the support, maintenance and suit money of the wife if she were without means; and since, during his lifetime, it was his right and privilege to make such disposition of his property as he saw fit, the fears of the wife which deterred her from protecting her rights were merely fears that the husband would do what, under the law, he had a perfect right to do.

So far as the testimony of witnesses Bottom and Huddart is concerned, it is to the same effect as the offered testimony of the plaintiff.  For the same reason it is immaterial, and the ruling of the court excluding it could not have been prejudicial.

Furthermore, we think the conduct of the plaintiff, as here shown, is a ratification of her contract; and she is likewise prohibited by the proper application of the rule of laches from now impeaching it.  No express ratification is necessary.  Any act of recognition of the contract (retaining the fruits of it through many years) has the effect of an election to affirm.  Acts of dominion exercised over the property received under the contract *after knowledge of the ground of rescission* amount to a ratification.  Laches need not be specially pleaded, and, without such plea, it is entirely within the power of the court, either at the trial or upon review, to dismiss an action upon that ground.  *French*

v. *Woodruff*, 25 Colo. 339-352, 54 Pac. 1015; *Hagerman v. Bates*, 24 Colo. 71-80, 49 Pac. 139; *Reed v. Reed,* 52 Mich. 117, 17 N. W. 720, 55 Am. St. 142.

When a court sees neglect on one side and injury therefrom on the other, it is a ground for denial of relief. *Bement v. LaDow*, 66 Fed. 185 (C. C.).

One who, knowing his rights, takes no steps to enforce them until the condition of the other party has in good faith become so changed that he can not be restored to his former state if the rights be then enforced, is estopped by the doctrine of laches from assertion of the rights. *Chase v. Chase,* 20 R. I. 202, 37 Atl. 804.

Certainly Mrs. Hughes, long prior to the death of her husband, knew her rights. Certainly she took no steps to enforce them. Certainly, the condition of Hughes has become so changed that he can not be restored to his former state.

Plaintiff says she was coerced by her husband's threat to do a lawful thing into entering into a solemn contract with him settling all their property rights. She took the property and money given her under that contract and pretended to be satisfied. She says she made that pretense to prevent her husband from dealing with his property as he had a right to do, and for the purpose of convincing him that all financial questions growing out of their marriage relations were settled; that she bided her time in silence, with no intention of keeping her contract, until death had stopped her husband's mouth, and she now claims the right to what must of necessity be an *ex parte* hearing on her principal allegations, and the right to reap the fruits of her watchful waiting. The husband had deserted her (she says without cause) and welcomed a suit for divorce or separate maintenance. According to her testimony, he seemed to have no fear as to what such an action would reveal as to his own conduct. It was this plaintiff who then saw fit to accept what she could get, rather than submit her claims and her conduct to the tribunal whose aid she now

seeks when there is no one to dispute her contention. Certainly here, if ever, must the doctrine of laches be applied.

Again, plaintiff's whole claim to a recovery is based upon an alleged fraud perpetrated on her by her husband. A well settled rule of law required her, in such case, to take proper steps to set aside her contract within a reasonable time after the fact of the fraud became known to her. The fraud, if any, consisted in her husband's misrepresentations to her as to his financial standing. An essential element of recovery is that she believed such representations and was misled thereby to her detriment. She makes no such allegation in her pleadings, introduces no evidence thereof, and makes no offer of such proof. In fact, her pleadings and her offer of proof show the contrary. If she were so misled at the time of the execution of this contract, there must have been some time between that date and the date of the bringing of this action when the facts became known to her. We search this record in vain for any pleading, or for the offer of evidence, of any such discovery.

From the foregoing, it must be concluded that the evidence offered and rejected by the court was immaterial; that plaintiff was not injured by that ruling; that she ratified the contract; that she is now prohibited by the doctrine of laches from impeaching its validity; that, granting the truth of all her testimony, rejected or received, there is no evidence of her having been misled by any material false representations made to her by her husband; and that she pleaded no facts upon which such evidence could be admitted.

The judgment of the trial court is accordingly affirmed.